**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PURUSHOTHAMAN RAJARAM, | No.22-16870 |
| *Plaintiff-Appellant*, | D.C. No. 3:22-cv-02920-LB |
| v. | |
| META PLATFORMS, INC., FKA Facebook, Inc., | OPINION |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Northern District of California
Laurel D. Beeler, Magistrate Judge, Presiding

Argued and Submitted October 4, 2023
University of Hawaii at Manoa

Filed June 27, 2024

Before:  Marsha S. Berzon, Eric D. Miller, and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge Miller;
Dissent by Judge VanDyke

## SUMMARY[*]

### Employment Discrimination

Reversing the district court's dismissal of an employment discrimination action, and remanding, the panel held that 42 U.S.C. § 1981 prohibits discrimination in hiring against United States citizens on the basis of their citizenship.

Purushothaman Rajaram, a naturalized United States citizen, alleged that Meta Platforms, Inc., refused to hire him because it prefers to hire noncitizens holding H1B visas to whom it can pay lower wages.

Section 1981(a) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Disagreeing with the Fifth Circuit, the panel held that, according to the statutory text, section 1981 prohibits employers from discriminating against United States

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

citizens because an employer that does so gives one class of people—noncitizens, or perhaps some subset of noncitizens—a greater right to make contracts than "white citizens." If some noncitizens have a greater right to make contracts than "white citizens," then it is not true that "[a]ll persons" have the "same right" to make contracts as "white citizens."

Dissenting, Judge VanDyke, applying what he thought was the better reading of an admittedly ambiguous text, and informed by the statutory development of section 1981, concluded that the statute does not protect citizens from discrimination on the basis of citizenship.

---

## COUNSEL

Daniel L. Low (argued) and Daniel Kotchen, Kotchen & Low LLP, Washington, D.C., for Plaintiff- Appellant.

Lauren R. Goldman (argued), Gabrielle Levin, and Emily Black, Gibson Dunn & Crutcher LLP, New York, New York; Kelley Pettus, Gibson Dunn & Crutcher LLP, Denver, Colorado; Michele L. Maryott and Daniel R. Adler, Gibson Dunn & Crutcher, Irvine, California; for Defendant-Appellee.

## OPINION

MILLER, Circuit Judge:

This case presents the question whether 42 U.S.C. § 1981 prohibits discrimination in hiring against United States citizens on the basis of their citizenship. We conclude that it does.

Purushothaman Rajaram is a naturalized United States citizen and an information technology professional with experience managing software development projects. On several occasions between 2020 and 2022, he unsuccessfully applied to work at Meta Platforms, Inc., which operates Facebook, Instagram, and WhatsApp, among other online services. He alleges that Meta refused to hire him because it prefers to hire noncitizens holding H-1B visas to whom it can pay lower wages. The H-1B program allows employers to hire qualified foreign workers for specialty occupations when there is a shortage of skilled workers authorized to work in the United States. *See* 8 C.F.R. § 214.2(h)(1)(ii)(B).

Rajaram brought this putative class action asserting a single claim: that Meta violated section 1981 by discriminating against United States citizens in hiring. The district court dismissed the complaint, holding that section 1981 "does not bar discrimination based on U.S. citizenship."

We review the district court's interpretation of the statute de novo. *United States v. Salazar*, 61 F.4th 723, 726 (9th Cir. 2023). We begin with the statutory text. *Hall v. United States*

*Dep't of Agric.*, 984 F.3d 825, 837 (9th Cir. 2020)*.* Entitled "Statement of equal rights," section 1981(a) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Two aspects of section 1981 are not in dispute. First, although the statute does not expressly provide a cause of action for those injured by violations of the nondiscrimination principle it sets out, it impliedly "affords a federal remedy against discrimination in private employment." *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460 (1975). The parties agree that "[a]n individual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages." *Id.*

Second, while a plaintiff bringing a claim under section 1981 "must initially identify an impaired 'contractual relationship' . . . under which the plaintiff has rights," section 1981 "protects the would-be contractor along with those who already have made contracts." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). In other words, section 1981 imposes liability when defendants have discriminated in a way that "prevented individuals who 'sought to enter into contractual relationships' from doing

so." *Id.* (quoting *Runyon v. McCrary*, 427 U.S. 160, 172 (1976)) (emphasis omitted).

The disputed question is whether section 1981 prohibits employers from discriminating against United States citizens. The statutory text answers that question in the affirmative. An employer that discriminates against United States citizens gives one class of people—noncitizens, or perhaps some subset of noncitizens—a greater right to make contracts than "white citizens." If some noncitizens have a *greater* right to make contracts than "white citizens," then it is not true that "[a]ll persons" have the "*same* right" to make contracts as "white citizens." That is precisely what the literal text of the statute prohibits.

Meta insists that the observation "that the statute protects 'all persons' . . . ducks the question presented by this appeal," which is "not *who* can sue under Section 1981, but *what* plaintiffs can sue about." In Meta's view, the statute's "protections are limited to discrimination based on race or alien status, not discrimination based on U.S. citizenship." Meta's reading appears to rest on the idea that "the same" should not be read literally. Rather, it argues, the statute does not prohibit employers from affording noncitizens greater rights than "white citizens" because the rights of "white citizens" are merely the floor to which the rights of "[a]ll persons" are raised. Thus, accepting Meta's position would require us to accept that when Congress wrote "the same" rights, it really meant rights "at least as great as" those of white citizens.

The problem with Meta's position is that "the same" means "the same." It does not mean "at least as great as." Meta does not suggest that "the same" meant something different when the statute was enacted, nor does it provide

"contextual evidence that Congress intended to depart from the ordinary meaning" of that phrase. *Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1161 (9th Cir. 2023). Because the words of section 1981 are unambiguous, "our 'sole function' is to enforce the statute according to its clear terms." *Id.* at 1163 (quoting *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004)); *see Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

Meta suggests that "all persons" in section 1981 refers to the persons permitted to sue to obtain the same rights as white citizens. Under that reading, citizens are not protected because they necessarily—indeed, tautologically—have the same rights as citizens. But the statute states a principle of parity between "all persons" and "citizens," violated if some persons have either greater or lesser rights than citizens. If noncitizens have greater rights than citizens, then the statute's guarantee is violated, and an aggrieved party—here, an injured citizen—may invoke the cause of action recognized in *Johnson* to equalize the rights that "all persons" are afforded. 421 U.S. at 460.

Our reading of the statutory text is reinforced by the Supreme Court's decision in *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273 (1976). In that case, white employees of a company were fired for theft, but a black employee charged with the same offense was not. *Id.* at 276. The fired employees sued under section 1981, alleging that they had been discriminated against on the basis of their race. *Id.* The Court held that they had stated a claim under section 1981 because an "examination of the language and history of § 1981 convinces us that § 1981 is applicable to racial discrimination in private employment against white

persons." *Id.* at 286–87. In so holding, it rejected an argument similar to Meta's, explaining that "we cannot accept the view that the terms of § 1981 exclude its application to racial discrimination against white persons." *Id.* at 287. The Court noted that "the statute explicitly applies to '*all* persons,' . . . including white persons." *Id.* It explained that "[w]hile a mechanical reading of the phrase 'as is enjoyed by white citizens' would seem to lend support to" the employer's position, the Court had "previously described this phrase simply as emphasizing 'the racial character of the rights being protected.'" *Id.* (quoting *Georgia v. Rachel*, 384 U.S. 780, 791 (1966)). It then added that, "[i]n any event, whatever ambiguity there may be in the language of § 1981 . . . is clarified by an examination of the legislative history," which suggests that the statute "appl[ies] to 'every race and color.'" *Id.* (quoting Cong. Globe, 39th Cong., 1st Sess. 211 (1866) (statement of Sen. Trumbull)).

This case, to be sure, concerns citizenship discrimination, not racial discrimination. The history of the relationship between the racial and citizenship aspects of section 1981 is therefore helpful in understanding why *McDonald* governs here.

Section 1981 combines a portion of section 1 of the Civil Rights Act of 1866 (1866 Act), ch. 31, § 1, 14 Stat. 27, with section 16 of the Enforcement Act of 1870 (1870 Act), ch. 114, § 16, 16 Stat. 140, 144. *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 385 (1982). The 1866 Act declared that "citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 1866 Act, § 1, 14 Stat. 27. "The principal object of the [1866]

legislation was to eradicate the Black Codes, laws enacted by Southern legislatures imposing a range of civil disabilities on [freed slaves]." *General Bldg. Contractors Ass'n*, 458 U.S. at 386.

Section 16 of the 1870 Act was an exercise of Congress's power under the recently ratified Fourteenth Amendment in response to California legislation restricting the rights of Chinese immigrants. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *Anderson v. Conboy*, 156 F.3d 167, 173 (2d Cir. 1998) (explaining that section 16 addressed "the plight of Chinese immigrants in California, who were burdened by state laws restricting their ability to work [and] removing their right to give testimony at trial"). To that end, the 1870 Act extended the protections of the 1866 Act to "all persons" rather than "citizens" alone. 1870 Act, § 16, 16 Stat. 144.

Although the type of discrimination alleged here is more closely related to the 1870 change from "all citizens" to "all persons" than to the racial language in the 1866 Act discussed in *McDonald*, *see* 427 U.S. at 289, the *McDonald* Court's reading of section 1981 governs this case. The statute guarantees "[a]ll persons . . . the same right . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). If white persons as well as nonwhite persons can sue to enforce that guarantee—a principle the *McDonald* Court considered "explicitly" set out in the text—then so too can citizens as well as noncitizens. 427 U.S. at 287.

Of course, there is at least one non-textual reason to treat racial discrimination differently from citizenship discrimination: If the *McDonald* Court had read section 1981 to prohibit discrimination against persons of some races but not others, it would have raised serious constitutional

questions. *See Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995) ("[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny."); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). No such questions would arise from reading the statute to protect aliens but not citizens. *See Korab v. Fink*, 797 F.3d 572, 578 (9th Cir. 2014) ("Congress may enact laws distinguishing between citizens and aliens so long as those laws are rationally related to a legitimate government interest.").

But the *McDonald* Court nowhere discussed—or even hinted at—the principle of constitutional avoidance. More importantly, even if the Court was motivated by "constitutional concerns" posed "by one of the statute's applications," that "cannot justify giving the *same* . . . provision a different meaning" here simply because the current application does not raise the same constitutional concern. *Clark v. Martinez*, 543 U.S. 371, 380 (2005). A statute is not "a chameleon, its meaning subject to change depending on the presence or absence of constitutional concerns in each individual case." *Id.* at 382. If one statutory construction "would raise . . . constitutional problems," the other construction should prevail across *all* applications "whether or not those constitutional problems pertain to the particular litigant before the Court." *Id.* at 380–81.

Looking beyond section 1981 itself, Meta argues that a neighboring provision shows that the statute does not prohibit discrimination against citizens. As noted above, although section 1981 has its ultimate origins in the 1866 Act, the present text derives from the 1870 Act. *See Runyon*, 427 U.S. at 168 n.8; *General Bldg. Contractors Ass'n*, 458 U.S. at 385. Specifically, section 16 of the 1870 Act

provided that "all persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and none other." 1870 Act § 16, 16 Stat. 144. That provision was followed by a criminal prohibition "designed to enforce section 16's grant of substantive rights." *United States v. Otherson*, 637 F.2d 1276, 1282 (9th Cir. 1980). Section 17 of the 1870 Act, codified as amended at 18 U.S.C. § 242, made it an offense to subject "any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens." 1870 Act § 17, 16 Stat. 144. Pointing out that section 17 expressly bars discrimination based on alienage, Meta contends that section 16—and by extension, section 1981—should similarly be read to bar discrimination based on alienage but not discrimination based on United States citizenship. *See Otherson*, 637 F.2d at 1282 (noting that reading section 17 as "coextensive with the grant of substantive rights [in section 16] best promotes the statutory purpose of protecting those rights").

The problem with that argument is that section 16, like section 1981 today, sets out two different guarantees of equal treatment: a guarantee of an equal right to make and enforce contracts, and a separate guarantee of being "subject to like punishment, pains, [and] penalties." Although section 17 mentions alienage, it does so only in connection with the second guarantee, barring the infliction of "different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race." That

reading is confirmed by *United States v. Classic*, in which the Supreme Court held that "[t]he qualification as to alienage, color and race, is a parenthetical phrase in the clause penalizing different punishments 'than are prescribed for citizens,' and in the common use of language could refer only to the subject matter of the clause and not to that of the earlier one relating to the deprivation of rights to which it makes no reference in terms." 313 U.S. 299, 326 (1941). Thus, even though the enforcement section should be read as coextensive with the grant of substantive rights, the alienage limitation informs our reading of only the second clause of section 1981(a), which refers to differences in punishment and is not at issue here.

Meta also advances a series of non-textual arguments, but we find none persuasive. First, it invokes legislative history. But the statutory text is clear, and "[l]egislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *Milner v. Department of Navy*, 562 U.S. 562, 574 (2011). In any event, nothing in the legislative history is inconsistent with reading the statute to reach claims brought by citizens. At most, as with claims of race discrimination by white persons, the legislative history suggests that Congress was not focused on such claims. *Cf. McDonald*, 427 U.S. at 289 (observing that "the immediate impetus for the [1866] bill was the necessity for further relief of the constitutionally emancipated former . . . slaves"). Even though claims by citizens were "not the principal evil Congress was concerned with" in enacting section 1981, "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). "'[I]n the context of an unambiguous statutory text,' whether a specific application was

anticipated by Congress 'is irrelevant.'" *Bostock v. Clayton Cnty.*, 590 U.S. 644, 677 (2020) (quoting *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)).

Second, Meta points to a subsequent enactment, the Immigration Reform and Control Act of 1986, which prohibits "discriminat[ing] against any individual . . . because of such individual's citizenship status." Pub. L. No. 99-603, § 102, 100 Stat. 3374 (codified at 8 U.S.C. § 1324b(a)(1)(B)). Meta says that in enacting that statute, "Congress recognized that '[n]o Federal law now prohibits discrimination on the basis of citizenship status.'"

The quoted language is from a statement of minority views accompanying a report of the House Judiciary Committee. H.R. Rep. No. 682, 99th Cong., 2d Sess., pt. 2, at 46 (1986). We agree with the District of Columbia Circuit that "[p]ost-enactment legislative history—perhaps better referred to as 'legislative future'—becomes of absolutely no significance when the subsequent Congress (or more precisely, a committee of one House)," and here, only a minority of the committee, "takes on the role of a court and in its reports asserts the meaning of a prior statute." *United States ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*, 173 F.3d 870, 878–79 (D.C. Cir. 1999).

Moreover, even on Meta's interpretation of section 1981, the minority statement accompanying the committee report did not accurately describe the law in 1986. The quoted sentence also notes that "under EEOC guidelines citizenship requirements are already deemed violative of Title VII when they have the purpose or effect of discriminating against an individual on the basis of national origin." H.R. Rep. No. 682, pt. 2, at 46. That language suggests that the committee minority used the phrase

"discrimination on the basis of citizenship status" to refer both to discrimination based on the status of being a citizen and also to discrimination based on the status of being a noncitizen. Meta does not dispute that section 1981 prohibits discrimination against noncitizens. *See Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419–20 (1948); *Sagana v. Tenorio*, 384 F.3d 731, 739 (9th Cir. 2004). Thus, contrary to the statement in the report, there has long been a prohibition in section 1981 against at least some forms of discrimination based on citizenship status.

Ultimately, what Congress may have believed about the state of the law in 1986 is irrelevant to the question before us. "[L]ater enacted laws . . . do not declare the meaning of earlier law." *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998); *see also Wright v. West*, 505 U.S. 277, 295 n.9 (1992).

Third, Meta argues that our interpretation would lead to nonsensical results if extended to other antidiscrimination statutes. Meta observes that "[i]f Congress or a state legislature wants to protect only the elderly, we don't assume it also meant to protect young people." It is of course true that the Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 602, which prohibits "discriminat[ion] . . . because of [an] individual's age," does not prohibit discrimination against the young. 29 U.S.C. § 623(a)(1). But the Supreme Court's decision establishing that proposition illustrates the flaw in Meta's argument. In *General Dynamics Land Systems, Inc. v. Cline*, employees between the ages of 40 and 50, who were covered under the statute, *see* 29 U.S.C. § 631(a), alleged that their employer engaged in age discrimination when it eliminated a retirement benefits program for workers under 50 while retaining the program for older workers. 540 U.S. 581, 584–

85 (2004). The Court noted that the word "age" can carry two different meanings—as, for example, in statements such as "Age can be shown by a driver's license," and "Age has left him a shut-in"—and it held that the "context shows that 'age' means 'old age' when teamed with 'discrimination.'" *Id.* at 596. *Cline* therefore does not establish a general principle that antidiscrimination statutes should be read to apply asymmetrically, any more than our decision today rests on what Meta calls a general "principle of 'reverse discrimination.'" Rather, as in *Cline*, we interpret the statute before us according to the most natural meaning of its text.

Finally, we acknowledge that our conclusion differs from that of the only other court of appeals to consider this issue. In *Chaiffetz v. Robertson Research Holding, Ltd.*, the Fifth Circuit rejected a section 1981 claim asserted by an American employee of a British company who alleged that his employer failed to promote him because of his citizenship. 798 F.2d 731, 732 (5th Cir. 1986). The court rejected the plaintiff's reliance on *McDonald*, reasoning that it "does not follow" that because section 1981 protects white persons from racial discrimination, it also protects citizens from citizenship discrimination. *Id.* at 735. "Discrimination against whites is racial discrimination," the court stated, "but (in America) discrimination against Americans can never be discrimination based on alienage." *Id.* (emphasis omitted).

Given everything we have said so far, the problem with that reasoning should be apparent. Discrimination based on alienage is indeed different from racial discrimination, but it is not different in any way that is relevant to the text of section 1981. Nowhere does the statute "use the term 'alien' to describe those to whom it extends protection." *Jimenez v. Servicios Agricolas Mex, Inc.*, 742 F. Supp. 2d 1078, 1085 (D. Ariz. 2010). Instead, it guarantees that "[a]ll persons . . .

shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Rajaram alleges that Meta has violated that guarantee by giving noncitizens a greater right than citizens to contract for employment. He has therefore stated a claim under section 1981.

**REVERSED and REMANDED**.

VANDYKE, Circuit Judge, dissenting:

This is a hard case. The majority seems to think otherwise because it claims the text of Section 1981 "clear[ly]" protects citizens from discrimination on the basis of citizenship. That conclusion is appealing, but not because of textual clarity. It's appealing because it's natural to think that if Congress protected noncitizens then surely it must have protected citizens too.

But the text just says that Section 1981 protects "[a]ll persons'" enjoyment of the "same right[s]" as "white citizens." This could be read as a "leveling-up" requirement—everyone gets the same rights established by some benchmark (here, "white citizens"). Under that reading, since citizens definitionally *always* have the same rights as citizens, they are not protected by the statute. On the other hand, I suppose the statute could be read, as the majority reads it, as a strict equalizing statute—everyone gets the same rights, period. If someone has more rights than citizens, then citizens can sue to get equalized. Of course, if that is what Congress meant, then one wonders why the text includes "as is enjoyed by white citizens" at all, since it seems entirely unnecessary. Just say everybody gets the same rights.

In justifying its supposedly clear reading of the text, the majority relies on *McDonald v. Santa Fe Trail Transportation Co.*, in which the Supreme Court concluded that defining the rights as those "enjoyed by white citizens" did not preclude whites from protection against racial discrimination. 427 U.S. 273, 286–87 (1976). But the Supreme Court's reasoning in *McDonald* is nothing like the majority's "textual" rationale here. That's because, as my colleague Judge Berzon candidly acknowledged during oral argument, *McDonald* was written "when the notion that one has to stick to the language and nothing else was not prevalent." Far from supporting the majority's conclusion today that the text is clear, the Supreme Court in *McDonald* barely addressed Section 1981's text, acknowledged that a "mechanical reading" of it cut the other way, and then decided the case based on an extensive review of legislative history about *race*—legislative history that has nothing to do with the *citizenship* question before us. So it is more than a bit strange to rely on *McDonald* as somehow bolstering the majority's terse yet confident textual analysis.

In reality, Section 1981's text is not as clear as the majority makes it out to be, and *McDonald* does nothing to resolve its ambiguity. Applying what I think is the better reading of an admittedly ambiguous text, and informed by the statutory development of Section 1981, I conclude that the statute does not protect citizens from discrimination on the basis of citizenship. In concluding otherwise, the majority unnecessarily creates a circuit split with the Fifth Circuit. I respectfully dissent.

## I.  **This is a harder case than the majority makes it out to be.**

The majority's plain text reasoning is tempting.  The text of the statute reads that "[a]ll persons … shall have the same right[s] … as [are] enjoyed by white citizens."  42 U.S.C. § 1981(a).  The statute's text sets a standard that "[a]ll persons'" rights are pegged to.  So maybe everyone can have the "same right[s]"—no less, *but no more either*—as those enjoyed by "white citizens."

Our first clue that this interpretation may not be the only, or even the best, reading of Section 1981 comes from the Supreme Court's decision in *McDonald*.  In *McDonald*, the Court determined that Section 1981 protects not only nonwhites' ability to enjoy the same rights as white citizens as the text plainly requires, but it also protects white persons from racial discrimination.  427 U.S. at 286–87.  In reaching that conclusion, the Court observed, like the majority does here, that the "statute explicitly applies to 'all persons,' including white persons."  *Id.* at 287 (cleaned up).

The scope of the people protected, therefore, was not limited to nonwhites.  But the scope of the class protected does not control *what* rights of that class are protected.  "All persons" might fall within the scope of Section 1981, but that doesn't tell us what rights the statute guarantees for all those people.  Nor does the phrase "same right[s]."  Indeed, if "[a]ll persons" and "same right" were the determinative phrases as to the *scope* of the rights protected, then Section 1981 could be read to prohibit discrimination based on any characteristic—gender, religion, disability, age, political affiliation, etcetera.  Nobody thinks that, including this court.  *See Sagana v. Tenorio*, 384 F.3d 731, 738 (9th Cir. 2004).

What seems to do the work of defining the rights protected by Section 1981 is the phrase "as is enjoyed by white citizens." The Court in *McDonald* agreed, focusing the weight of its analysis on the import of this phrase. And this phrase is much more ambiguous than the majority here would like to admit. Contrary to the majority, one possible reading of the phrase "as is enjoyed by white citizens" is that it textually defines the rights guaranteed to "[a]ll persons" to be those enjoyed by white citizens. If this is correct, then "white citizens" are not protected because they, by definition, *always* enjoy the same rights as white citizens. So even though they might generally fall within the scope of the class protected by the statute—all people—they could never be disadvantaged because their rights would never *not* be the same rights as enjoyed by … themselves. But don't just take my word for it. The Court in *McDonald* acknowledged that "a mechanical reading of the phrase 'as is enjoyed by white citizens' would seem to lend support" to the interpretation that the statute "unambiguously limits itself to the protection of nonwhite persons against racial discrimination." 427 U.S. at 286–87.

But while the Court acknowledged that the text of Section 1981 weighed *against* protecting whites, it ultimately concluded that whites *are* protected by Section 1981. It did so by privileging legislative history over what it brusquely conceded was the contrary reading of the text. The Court's reasoning in *McDonald* was almost entirely governed by legislative history—the Court's textual analysis spanned three sentences, followed by nearly ten pages on legislative history. *Id.* at 287–296. The Court extensively examined the legislative floor debates on the bill and the amendments it underwent while passing between the chambers. *Id.* For example, Senator Trumbull, who

introduced the bill, stated during debate that "[t]his bill applies to white men as well as black men." *Id.* at 290. And speaking directly to Representative Wilson's addition of the phrase "as is enjoyed by white citizens" as the bill passed through the House, the Court concluded that the structure of the bill as it then stood and Wilson's own statements made clear that this was merely a clarifying amendment to "emphasize the racial character of the rights being protected." *Id.* at 293 (citation omitted). Relying on the "cumulative evidence of congressional intent," the Court concluded that "the Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *Id.* at 295.

*McDonald*, therefore, is not a helpful case for the majority. First, it makes clear that, contrary to the majority's short textual analysis, nothing in the text of Section 1981 "clearly" supports the majority's interpretation—indeed, a "mechanical reading" of the text "would seem to lend support to [the] reading of the statute" that "white citizens" are not protected. *Id.* at 287. And second, *McDonald*'s eschewing of textual analysis for a long march through legislative history makes it a most unlikely candidate to support the majority's purportedly "clear" textual conclusion.

Undeterred, the majority takes *McDonald*'s conclusion that "white persons as well as nonwhite persons can sue to enforce [the statute's] guarantee" and extrapolates that "so too can citizens as well as noncitizens." The majority wants to rely on *McDonald*'s conclusion while ignoring *McDonald*'s use of legislative history. But *McDonald*'s holding cannot be divorced from its reasoning. The majority can't have it both ways: it can't pretend it's just following the "clear" text of Section 1981 while spending more time

wrapping itself in *McDonald*'s atextual result than fairly analyzing the statute's textual ambiguity.

Even the legislative history that drove the decision in *McDonald* is not helpful in this case. If such an analysis were appropriate, the same legislative history that supported reading the statute as prohibiting discrimination against whites does not support reading it to forbid discrimination against citizens. As the Court explained in *McDonald*, the legislative history of the statute was focused on its racial aspect. Senator Trumbull, in advocating for the passage of the bill in the Senate, argued that it would "guaranty to every person of every color the same civil rights." Cong. Globe, 39th Cong. 1st Sess. 599–600 (1866). Representative Wilson, after adding the phrase "as is enjoyed by white citizens" in an amendment, *id.* at 1115, similarly argued on the congressional floor that the purpose of the bill was to ensure that "[o]ne race shall not be more favored [with respect to the specified rights] than another," *id.* at 1117. The Congressional Globe is replete with such references to protections based on race, yet there is seemingly nothing in the legislative history to indicate that all people were intended to be protected from discrimination on citizenship grounds. Nor does the majority identify any evidence that the purpose of the bill was to defend against discrimination on the basis of citizenship.

And as the majority acknowledges, there is another reason "to treat racial discrimination differently from citizenship discrimination" in this context. Reading Section 1981 to prohibit discrimination against persons of some races, but not others, would implicate serious constitutional concerns. *See Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995) (holding that "all racial classifications, imposed by whatever federal, state, or local governmental

actor, must be analyzed by a reviewing court under strict scrutiny"). But providing protection for aliens, but not citizens, would not. *See Korab v. Fink*, 797 F.3d 572, 578 (9th Cir. 2014) ("Congress may enact laws distinguishing between citizens and aliens so long as those laws are rationally related to a legitimate government interest.").

The majority minimizes this difference by arguing that even if the constitutional concerns that may have driven the interpretation of the statute in *McDonald* are not present here, we need to interpret the same statutory provision consistently. But this case is interpreting a different term than *McDonald*. *McDonald* construed the term "white," and no one is suggesting we reject that construction. This case asks us how we should read the neighboring word "citizen."

At the end of the day, the text is just not unambiguous. If anything, there is better textual support for the reading the majority rejects: that discrimination because of citizenship is not covered by Section 1981 because citizens inherently possess the rights enjoyed by citizens, even when noncitizens are preferenced over them. Treating the term "citizen" like *McDonald* treated the word "white" suggests that this might not be the case. But *McDonald* applied a nontextual analysis, and its extended analysis of Section 1981's legislative history cannot be lifted uncritically from the racial context and simply transplanted to the citizenship one. Because *McDonald*'s anachronistic analysis is not, even on its own terms, helpful to the interpretive question presented in this case, we must unfortunately address that question from scratch, which I turn to now.

## II. Section 1981 does not protect against citizenship discrimination.

Starting with the text, Section 1981(a) provides, in full:

> All persons within the jurisdiction of the
> United States shall have the same right in
> every State and Territory to make and enforce
> contracts, to sue, be parties, give evidence,
> and to the full and equal benefit of all laws
> and proceedings for the security of persons
> and property as is enjoyed by white citizens,
> and shall be subject to like punishment, pains,
> penalties, taxes, licenses, and exactions of
> every kind, and to no other.

42 U.S.C. § 1981(a).  According to the text, "[a]ll persons"
are ensured the "same right[s] … as [are] enjoyed by white
citizens." *Id.*  As described above, one obvious reading is
that the statute affords all persons, regardless of race or
alienage, *at least* the same rights as enjoyed by white
citizens, and if another group is treated below that standard,
the statute makes up the difference.  But the text of the statute
does not explicitly say that all persons can be afforded *no
more* than those rights "enjoyed by white citizens."  *Id.*
Without any textual basis for leveling noncitizens down, the
claims brought by Rajaram—an American citizen—fall
outside of the statutory text.

　　Rajaram contends that Meta is violating Section 1981
because its hiring practices favor noncitizens over citizens.
He does not argue that he has been denied the rights enjoyed
by white citizens.   Instead, he relies on *McDonald*'s
conclusion that "white citizens" includes nonwhites to argue
that "citizens" means "people of any citizenship status"—
whether American or otherwise.  Thus, he asserts that under
Section 1981 noncitizens cannot be afforded more rights
than those afforded to American citizens.  But the text of
Section 1981 does not guarantee citizens the same rights as

enjoyed by noncitizens. It guarantees both citizens and noncitizens the same rights as those "enjoyed by white *citizens*." *Id.* (emphasis added).

It is true that the class of people protected by Section 1981 is broad, extending to "[a]ll persons within the jurisdiction of the United States." *Id.* But while the class is broad, we have previously held that the *protection provided* to that class is limited. It does not reach "discrimination on the basis of gender or religion, disability, age, or political affiliation." *Sagana*, 384 F.3d at 738 (internal citations omitted). And neither does it protect against discrimination on the basis of citizenship. Instead, it guarantees "[a]ll persons" only the rights "enjoyed by white citizens." Rajaram does not allege that he has not been treated as well as a citizen, but only that he has not been treated as well as a *noncitizen*. On this reading of the text, therefore, the disadvantage that he alleges is not one that the statute addresses.

The statutory evolution of Section 1981 confirms this interpretation of the text. Originating in Section 1 of the Civil Rights Act of 1866, *see* Civil Rights Act of 1866, ch. 31, Sec. 1, 14 Stat. 27, 27 (codified as amended at 42 U.S.C. § 1981(a)), the language from which Section 1981 comes did not originally protect aliens at all, and prohibited only racial discrimination. Section 1 provided that "all … citizens" shall have the same rights that "white citizens" enjoy. Sec. 1, 14 Stat. at 27; *see also Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 384 (1982). In Section 16 of the Enforcement Act of 1870, Congress extended Section 1's prohibition by replacing "all … citizens" with "all persons." Enforcement Act of 1870, ch. 114, Sec. 16, 16 Stat. 140, 144 (codified as amended at Sec. 1981(a)). That amendment granted noncitizens the same statutory rights as citizens,

thereby adding a ban on alienage discrimination. *See Sagana*, 384 F.3d at 738 ("The significance we attach to the drafters' changing 'all citizens' to 'all persons' to hold that aliens fall under the statute's protections, also compels the conclusion that [Section] 1981 protects against discrimination on the basis of alienage."). As that revision demonstrates, Congress was attentive to the distinction between "citizens" and noncitizen "persons." Congress made clear that the protections of the statute were not limited to "citizens"—but it said nothing about whether the law applied to discrimination purely *on the basis* of citizenship.

Section 16 "contain[ed] essentially the language that now appears in [Section] 1981." *Gen. Bldg. Contractors*, 458 U.S. at 385. Like Section 1981, Section 16 provided that "all persons … shall have the same right … to make and enforce contracts … as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind." Sec. 16, 16 Stat. at 144. In the adjacent Section 17, Congress imposed criminal sanctions that illustrate the scope of Section 16. Section 17 penalized any person who, under color of law, subjected "any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens." Sec. 17, 16 Stat. at 144. The sanction for the deprivation of any right in "the last preceding section" refers expressly to those rights in Section 16, and the sanction for "different punishment, pains, or penalties" corresponds to the "like punishments, pains, penalties, taxes, licenses, and exactions" that Section 16 requires. Secs. 16–17, 16 Stat. at 144. Thus, "Section 17 by

its plain language enforced the specific rights enumerated in Section 16." *Anderson v. Conboy*, 156 F.3d 167, 175 (2d Cir. 1998); *see also United States v. Otherson*, 637 F.2d 1276, 1282 (9th Cir. 1980) ("Section 16 grants these rights, and section 17 enforces that grant by criminalizing their deprivation.").

Section 16 granted the same right "as is enjoyed by white citizens," and Section 17 penalized discrimination that resulted from not being "white citizens." That meant discrimination against aliens: "different punishment, pains, or penalties on account of such person being an alien," as compared to the punishment "prescribed for … citizens." Sec. 17, 16 Stat. at 144. Like Section 16 and Section 1981, Section 17 identified "citizens" as the group against which to measure the treatment of those it protects.

The majority concludes that Section 17's reference to alienage in the second part of Section 17, barring the infliction of different punishment, does not apply to its first guarantee of the rights in Section 16. But it is not just the explicit reference to "alien[s]" in Section 17 that informs the scope of the right protected in Section 16. Instead, it is the consistent characterization of the protected rights as those of "citizens." Section 16 states that all people are entitled to the same rights as white citizens—this means that even noncitizens must enjoy the rights of citizens. Section 17 similarly protects aliens from receiving different punishments than citizens on account of their status as aliens. Together, Sections 16 and 17 consistently ensure that noncitizens will not be discriminated against in favor of citizens. In both cases, it is only noncitizens who can be harmed, because citizens definitionally enjoy the rights of citizenship. So while the legislative history relied on by the Court in *McDonald* suggests that the statute's protection is

not limited to "nonwhites," 427 U.S. at 295, the historical development of Section 1981 corroborates the better textual reading that alienage, not citizenship, is protected.

### III. The majority's opinion creates an unnecessary circuit split.

Finally, as the majority acknowledges, its conclusion is at odds with the Fifth Circuit's decision in *Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731 (5th Cir. 1986)—a case addressing the exact same issue—and thus creates a circuit split. In *Chaiffetz*, the Fifth Circuit held that the district court had "correctly concluded that [Section 1981] is inapplicable" because it "does not encompass discrimination based solely on national origin." *Id.* at 735 (quoting *Bullard v. Omi Georgia, Inc.*, 640 F.2d 632, 634 (5th Cir. 1981)). In doing so, the Fifth Circuit explicitly rejected the argument raised by Rajaram that Section 1981 protects against "reverse discrimination on the basis of alienage." *Id.* (internal quotation marks omitted).

As the majority does in this case, the plaintiff in *Chaiffetz* attempted to rely on *McDonald* to argue that "given the Supreme Court's interpretation of the applicability of [Section] 1981 to reverse discrimination on the basis of race, it is axiomatic that similar reverse discrimination against American citizens in favor of non-citizens is also proscribed." *Id.* (internal quotation marks omitted). This, according to the Fifth Circuit, "does not follow." *Id.* Rather, "[d]iscrimination against whites is racial discrimination, but (in America) discrimination against Americans can never be discrimination based on *alienage*. It can only be discrimination based on national origin," and such discrimination is not prohibited "under [Section] 1981." *Id.*

(emphasis in original).  The majority unnecessarily creates a circuit split where one should not exist.

\* \* \*

This is not an easy interpretive case, and I personally like the majority's conclusion better than mine.  It's only natural to think that this sort of discrimination protection should be reciprocal—if noncitizens can't be discriminated against in favor of citizens, then surely citizens shouldn't be disadvantaged in favor of noncitizens.  This reading is particularly appealing today, when conditions create more incentives to discriminate *against* citizens.  Illegal border crossings have increased year over year since 2021, with almost two million encounters reported during the first half of this fiscal year alone.  *See Nationwide Encounters*, U.S. Customs and Border Protection, https://www.cbp.gov/ newsroom/stats/nationwide-encounters.  Given that it is easier to pay such noncitizens lower wages, it's easy enough to see how this creates growing economic pressure to favor noncitizens over citizens.  A statute that protects against this sort of discrimination may be what this country needs, but it isn't what Congress gave us in Section 1981.  And it's not my role to transform this statute into what I wish it was.  I therefore reluctantly dissent.