UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| PURUSHOTHAMAN RAJARAM, et al., | Case No. 22-cv-02920-LB |
| Plaintiffs, | |
| | **ORDER DENYING DEFENDANT'S MOTIONS TO DISMISS PLAINTIFFS' SAC, STRIKE, & STAY DISCOVERY** |
| v. | |
| META PLATFORMS, INC., | Re: ECF Nos. 54, 56 |
| Defendant. | |

*United States District Court*
*Northern District of California*

## INTRODUCTION

This is a putative class action against Meta Platforms, Inc., formerly known as Facebook, Inc. The named plaintiffs — Purushothaman Rajaram, Ekta Bhatia, and Qun Wang — are U.S. citizens who applied for jobs with Meta between May 2020 and March 2022. They allege that Meta did not hire them because it favors H-1B visa holders because it can pay them less than U.S. citizens. (The H-1B program allows U.S. employers to temporarily hire qualified foreign workers for certain specialty occupations when the employers cannot otherwise obtain the needed skills from workers authorized to work in the U.S. 8 C.F.R. § 214.2(h)(1)(ii)(B).) The plaintiffs claim that this hiring practice violates 42 U.S.C. § 1981(a) by discriminating against U.S. citizens.[1]

---

[1] Second Am. Compl. (SAC) – ECF No. 46. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

Meta moved to dismiss the plaintiffs' second amended complaint (SAC) for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) on the grounds that the plaintiffs did not plausibly allege intentional discrimination by Meta or that the plaintiffs would not have been hired but for the alleged discrimination.[2] Meta also moved to strike references in the plaintiffs' complaint to allegations by the U.S. Department of Justice in a prior proceeding against Meta and for a stay of discovery pending the court's decision on the motion to dismiss.[3] The court denies the motions.

## STATEMENT

Meta is a "technology conglomerate" with products including Facebook, Instagram, Messenger, WhatsApp, and Meta Quests. It employs over 60,000 people worldwide, including (as of 2021) roughly 56,000 in the U.S.[4] The complaint alleges that Meta prefers to hire H-1B visa holders for certain U.S.-based positions because it can pay them less than U.S. citizens.[5] The plaintiffs are U.S. citizens who applied for multiple jobs with Meta, which did not hire them and, in one case, hired an H-1B visa holder instead.[6] In this putative class action, the named plaintiffs represent a class of non-visa holders who applied for, and were denied, employment at Meta as software engineers, research scientists, data scientists, data engineers, engineering managers, and product-lifestyle managers.[7]

The SAC centers on Meta's alleged hiring practices regarding H-1B visa holders and its failure to hire the plaintiffs.

---

[2] Mot. – ECF No. 54.

[3] Mot. – ECF No. 56.

[4] SAC – ECF No. 46 at 1–2 (¶ 1).

[5] *Id.* at 2 (¶ 2), 4–5 (¶ 16).

[6] *Id.* at 2 (¶ 4), 8–9 (¶¶ 25–32).

[7] *Id.* at 16–17 (¶ 64).

United States District Court
Northern District of California

## 1. Hiring Practices

Generally, H-1B visas allow foreign workers to work in the U.S. in specialty occupations, are limited in number (65,000 awarded through a lottery process and an additional 20,000 given to persons with advanced degrees), and are temporary (generally up to six years, with certain exceptions). The program aids employers who can hire foreign workers for these specialty jobs when they cannot otherwise find workers who have the requisite skills and are authorized to work in the U.S. Employers must pay H-1B visa holders at least as much as other individuals qualified for the jobs.[8] 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184; 8 C.F.R. § 214.2(h)(1)(ii)(B); 20 C.F.R. § 655.731(a).

The plaintiffs allege that Meta hires H-1B visa holders over U.S. citizens because it can pay them less.[9] Although H-1B visa holders make up "less than 0.5% of the overall U.S. workforce," Meta is "an H-1B visa dependent employer," meaning fifteen percent or more of its U.S. workforce has an H-1B visa.[10] The majority of Meta H-1B visa holders perform software engineer roles, but a "large number[] of H-1B visas are also secured for Meta's Research Scientists, Data Scientists, Data Engineers, and Engineering Managers." "[A]s Meta's U.S. workforce continues to grow, so does its reliance on H-1B visa workers, as indicated by the increased number of H-1B visa approvals":

| Year | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2022 |
|------|------|------|------|------|------|------|------|------|------|
| H-1B Approvals | 412 | 527 | 894 | 1,107 | 1,566 | 2,467 | 3,552 | 4,408 | 5,100[11] |

The plaintiffs cite a December 2020 administrative proceeding under 8 U.S.C. § 1324b brought by the U.S. Department of Justice — following an investigation — against Facebook for intentionally discriminating against U.S. workers "because of their citizenship or immigration

---

[8] *Id.* at 4–5 (¶ 16) (citing 8 C.F.R. § 214.2(h)(1)(ii)(B), (i)(l); 20 C.F.R. § 655.731(a)).

[9] *Id.* at 2 (¶ 2).

[10] *Id.* at 5 (¶ 17). The plaintiffs refined these statistics somewhat at the hearing, as discussed below.

[11] *Id.* at 4–5 (¶¶ 16–17 & n.4) (citing *H-1B Employer Data Hub Files*, U.S. Citizenship & Immig. Servs., http://www.bitly/2OpEyr2).

status by failing to recruit, consider, or hire [them] for permanent positions that it earmarks for the company's visa holders." From at least January 1, 2018, to at least September 18, 2019, Facebook's practice was to fill certain permanent positions only with existing Facebook visa holders seeking permanent positions and lawful-permanent residency. "Facebook took active steps to discourage U.S. workers from applying to the positions reserved for its visa holders, including by failing to advertise the open positions on its website, refusing to accept online applications for the roles, and requiring all interested candidates to mail in copies of their applications." By this practice, "Facebook was able to ensure that its temporary visa holders secured permanent positions through the permanent labor certification process, allowing them to remain in the U.S. beyond the 6-year period afforded by their H-1B visas."[12] The parties settled the case: Meta did not admit liability, paid a civil penalty of $4.75 million, paid $9.5 million into a settlement fund for potential victims, and agreed to change its recruitment process, including by changing how it posted jobs and accepted applications and agreeing to reject U.S. workers for the relevant positions only "for lawful, job-related reasons."[13]

### 2.  Failure to Hire Mr. Rajaram

Mr. Rajaram has a Bachelor of Engineering degree from Madras University and a Diploma in Mechanical Engineering from the Directorate of Technical Education, both in Chennai, India. He is "an experienced and highly skilled information technology professional" with almost twenty years of experience in delivering enterprise "Product Lifecycle Management" software solutions to Fortune 500 corporations. His technical skills include "[Product Lifecycle Management] administration, implementation, integration, and support." Since June 2014, he has worked as an independent [Product Lifecycle Management] technical consultant for "aerospace, energy, and technology customers (among others)."[14]

---

[12] *Id.* at 5–6 (¶¶ 19–20) (citing Compl., *United States v. Facebook, Inc.*, OCAHO Case No. 2021B00007, at 1–2 (¶¶ 2–3), 3 (¶¶ 9–10), 4 (¶ 17), 9 (¶ 42), 10 (¶¶ 48–49), https://bit.ly/3rMJzbF).

[13] *Id.* at 7 (¶ 21) (citing Settlement Agreement at 2–3, https://bit.ly/3nxZifd).

[14] *Id.* at 7–8 (¶ 24).

1
2
3

Mr. Rajaram "was considered for employment with Facebook on more than four occasions [starting in May 2020], but Facebook failed to hire him each time because of the company's systematic and continuous discriminatory scheme" of hiring visa holders.[15]

4
5
6
7
8
9
10
11
12
13
14

First, in May 2020, Facebook's third-party vendor Infosys contacted Mr. Rajaram via WhatsApp for a potential Product Lifestyle Management role. Mr. Rajaram submitted his resume, which listed his citizenship status as a naturalized U.S. citizen.[16] Three Infosys employees interviewed him later in May and gave him positive feedback, telling him that he was the "right guy" and "perfect" for the job.[17] On June 1, 2020, Infosys's client partner for Facebook asked whether Mr. Rajaram "would be available in approximately thirty minutes" to interview with a Facebook employee for the Product Lifestyle Management role. Later that evening, he interviewed with "a junior [Facebook] employee, which was evident by his questioning." Mr. Rajaram "understands" that the interviewer was "working for Facebook in the U.S. on an H-1B visa." Facebook did not hire Mr. Rajaram, "[d]espite [his] performing well in his interviews and being well-qualified for the role."[18]

15
16
17
18
19
20
21
22

Second, on June 19, 2020, after Mr. Rajaram sent him a resume (again reflecting his citizenship), a Product Lifestyle Management analyst at Facebook "referred Mr. Rajaram for a full-time position with the company." A Facebook technical sourcer contacted Mr. Rajaram, and they discussed the position for forty-five minutes to an hour. Mr. Rajaram described his experience, and the sourcer said that Facebook was "very interested in [his] candidacy" and that the sourcer would "present him to the team that was hiring for the role." On July 6, 2020, the sourcer told Mr. Rajaram that "the team decided not to move forward with the next steps." Facebook did not hire him for the Product Lifestyle Management analyst position and provided no

23
24
25
26
27
28

---

[15] *Id.* at 8 (¶ 25).

[16] *Id.* (¶ 26).

[17] *Id.* (¶ 27).

[18] *Id.* (¶ 28).

1    further explanation for rejecting him. "On information and belief, Facebook staffed the role with

2    an H-1B visa holder."[19]

3    　　Third, on March 10 and 22, 2022, Mr. Rajaram applied to Product Lifestyle Management

4    positions, again submitting a resume showing his U.S. citizenship. "Despite being well-qualified

5    for the roles," Facebook did not respond to his applications.[20]

6    　　Fourth, "over the past few years," Mr. Rajaram applied online for several Product Lifestyle

7    Management positions: manager, project manager, and architect. Facebook did not respond to his

8    applications.[21]

9

10   **3.  Failure to Hire Ms. Bhatia**

11   　　Ms. Bhatia is a Senior Software Engineer, holds a Bachelor of Science degree in Computer

12   Science, and has over four years of professional experience in the IT industry. She "has a wide

13   array of skills, which include the ability to program in a number of [programming] languages . . . ,

14   and experience in multiple software development frameworks and libraries." "Ms. Bhatia has held

15   a number of software engineering roles, working most recently as a Senior Software Engineer for

16   Goldman Sachs where she developed websites and applications, analyzed and improved site

17   speed, and tested and delivered codes."[22]

18   　　Ms. Bhatia applied to at least seven roles with Meta between 2022 and 2024. "Ms. Bhatia was

19   well-qualified for each of the roles, but Meta failed to hire her because of the company's

20   systematic and continuous discriminatory scheme."[23]

21   　　In March 2022, Bhatia received an email from Heather Teagle, a Meta technical sourcer,

22   saying that she was "impressed with Ms. Bhatia's academic success" and asking if she was

23   interested in "exploring a career with Meta." Ms. Bhatia applied to a software engineer role with

24

25   [19] *Id.* at 9 (¶ 29).

26   [20] *Id.* (¶ 30).

27   [21] *Id.* (¶ 31).

     [22] *Id.* at 10 (¶ 33).

28   [23] *Id.* (¶ 34).

United States District Court
Northern District of California

Meta and submitted a copy of her resume, which stated that she was a U.S. citizen. On a call with Ms. Teagle the following month, Ms. Bhatia again expressed interest in being considered for the software engineer role, and she completed a U.S. work authorization form for Meta, again confirming her citizenship.[24]

Ms. Bhatia was scheduled for a one-hour interview with Meta in May 2022, but Meta canceled the interview because it had "filled all existing positions that match [Ms. Bhatia's] experience and qualifications for th[e] role." Ms. Teagle noted to Ms. Bhatia that three other teams were hiring for similar positions but did not refer her to any of those teams.[25]

In June 2023, Ms. Bhatia applied to a "Software Engineer, Product – Generative AI" role with Meta and submitted a copy of her resume noting her citizenship status. In September 2023, a Meta technical sourcer, Ledonia Davis, asked if Ms. Bhatia would be open to relocating for the role, Ms. Bhatia confirmed that she was open to relocation, particularly to the Bay Area, and they scheduled an interview for mid-October. Prior to that interview, Ms. Bhatia completed the required U.S. work authorization form, confirming her citizenship. "Ms. Bhatia performed well in her October 2023 technical interview, and anticipated being advanced to the next round of interviews, given that she had written the code requested by her interviewer correctly," but Meta "decided not to move forward to next steps for the Software Engineer role," stating that "it was likely that [Meta] did not receive strong enough signals in the areas [it] hoped for."[26]

In October 2023 and January 2024, Ms. Bhatia applied to four roles with Meta, submitting a copy of her resume with her citizenship status for each. Meta did not contact, interview, or hire her for any position.[27]

In January 2024, Ms. Bhatia applied to a software engineer role with Meta, submitted a copy of her resume listing her citizenship status, and was contacted by Gretchen Smith, a recruitment screening specialist for Meta. Ms. Bhatia "understands that Ms. Smith called her because she had

---

[24] *Id.* (¶¶ 35–37).

[25] *Id.* at 11 (¶ 38).

[26] *Id.* at 11–12 (¶¶ 39–42).

[27] *Id.* at 12 (¶¶ 43–44).

recently received a recommendation from a Meta employee who was family with her skill set and experience." After confirming her interest in the role, Ms. Bhatia submitted a U.S. work authorization form, indicating that she did not require sponsorship.[28]

Ms. Bhatia passed an initial technical interview and performed well in her coding, design, and behavioral interviews, receiving positive feedback that was confirmed by Reece Lourdes, Ms. Bhatia's point of contact in the application process. Mr. Lourdes presented Ms. Bhatia's application in a review session with hiring peers but ultimately emailed Ms. Bhatia informing her that Meta would not be hiring her and that she was prohibited from reapplying to Meta for one year.[29]

### 4. Failure to Hire Mr. Wang

Mr. Wang is a data scientist with over fifteen years of relevant experience as a data scientist, manager, and consultant. He holds a Bachelor's degree in applied math, a Master's degree in engineering, and a Ph.D. in statistics and has "repeatedly served in leadership roles" in the IT industry. "Despite Mr. Wang's strong qualifications for the Data Scientist roles, he was not interviewed nor hired by Meta because of the company's systematic and continuous discriminatory scheme."[30]

Between January and May 2024, Mr. Wang applied to three data scientist roles with Meta. With each application, Mr. Wang submitted a copy of his resume listing his status as a U.S. citizen. Mr. Wang was well qualified for each role, exceeding the thirty-six months of required experience for one role and meeting both the minimum and preferred qualifications for the other two positions. Meta never contacted, interviewed, or hired Mr. Wang for these positions.[31]

Between June 18 and June 22, 2024, Mr. Wang applied to six data scientist roles with Meta, submitting copies of his resume listing his citizenship status. Despite being "well-qualified for each of the roles" through his "15+ years of relevant experience," Mr. Wang received no follow-

---

[28] *Id.* at 12–13 (¶¶ 45–47).

[29] *Id.* at 13–14 (¶¶ 48–55).

[30] *Id.* at 14 (¶¶ 56–57).

[31] *Id.* at 15 (¶¶ 58–60).

United States District Court
Northern District of California

up communications from Meta and was not interviewed nor hired for any of the roles. During the same period that Mr. Wang applied for these roles, Meta was "actively seeking PERM certifications and Labor Condition Application certifications for Data Scientist roles, which would allow the company to fill these roles (or continue staffing those roles) with non-citizen visa workers."[32]

### 5. Relevant Procedural History

In 2022, the plaintiffs filed a complaint and first amended complaint (FAC), alleging that Meta had discriminated against Mr. Rajaram based on his U.S. citizenship in violation of 42 U.S.C. § 1981.[33] Meta moved to dismiss the FAC, arguing that § 1981 did not cover discrimination based on U.S. citizenship.[34] The court granted the motion.[35] The plaintiff appealed, and the Ninth Circuit reversed. *Rajaram v. Meta Platforms, Inc.*, 105 F.4th 1179 (9th Cir. 2024).

In 2024, the plaintiffs filed their SAC, adding allegations for Ms. Bhatia and Mr. Wang. The plaintiffs' § 1981 claim in the SAC is essentially the same as in the FAC: Meta discriminated against the plaintiffs through an alleged "pattern and practice of discriminating against individuals who are not visa holders" by "(a) knowingly and intentionally favoring individuals with visas in job placement (*i.e.*, hiring/staffing) decisions, and (b) knowingly and intentionally disfavoring individuals who are not visa holders (including [the] [p]laintiff) in job placement (*i.e.*, hiring/staffing) decisions."[36] Meta moved to dismiss the SAC, strike allegations from referencing a separate (now settled) proceeding initiated by the DOJ against Meta, and to stay discovery pending the court's decision on the motion to dismiss.[37]

---

[32] *Id.* at 16 (¶¶ 61–62).

[33] Compl. – ECF No. 1; First Am. Compl. – ECF No. 10.

[34] Mot. – ECF No. 25.

[35] Order – ECF No. 34.

[36] SAC – ECF No. 46 at 18–19 (¶¶ 73–77).

[37] Mot. – ECF No. 54; Mot. – ECF No. 56.

1    It is undisputed that the court has subject-matter jurisdiction. 28 U.S.C. §§ 1331–1132;

2    42 U.S.C. § 1981(a). All parties consented to magistrate-judge jurisdiction under 28 U.S.C.

3    § 636.[38] The court held a hearing on February 6, 2025.

4

5                                    **STANDARD OF REVIEW**

6    **1.  Rule 12(b)(6)**

7    A complaint must contain a "short and plain statement of the claim showing that the pleader is

8    entitled to relief" to give the defendant "fair notice" of (1) what the claims are and (2) the grounds

9    upon which they rest. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

10   (2007). Thus, "[a] complaint may fail to show a right to relief either by lacking a cognizable legal

11   theory or by lacking sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank*

12   *N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016).

13   A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide

14   the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a

15   formulaic recitation of the elements of a cause of action will not do. Factual allegations must be

16   enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (cleaned

17   up). A complaint must contain factual allegations that, when accepted as true, are sufficient to

18   "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009);

19   *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 838 F. App'x 231, 234 (9th

20   Cir. 2020) ("[O]nly the *claim* needs to be plausible, and not the facts themselves . . . ."); *see*

21   *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886–87 (9th Cir. 2018) (the court must

22   accept the factual allegations in the complaint "as true and construe them in the light most

23   favorable to the plaintiff" (cleaned up)).

24   Put another way, "[a] claim has facial plausibility when the plaintiff pleads factual content that

25   allows the court to draw the reasonable inference that the defendant is liable for the misconduct

26   alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability

27

28   ---

[38] Consents – ECF Nos. 8, 15.

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (cleaned up).

If a court dismisses a complaint, it should give leave to amend unless the "pleading could not possibly be cured by the allegation of other facts." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1182 (9th Cir. 2016) (cleaned up).

## 2. Rule 12(f) Motion to Strike

Motions to strike are governed by Rule 12(f) of the Federal Rules of Civil Procedure. That rule provides: "The court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The function of a [Rule 12(f)] motion to strike is to avoid the unnecessary expenditures that arise throughout litigation by dispensing of any spurious issues prior to trial." *Rosales v. FitFlop USA, LLC*, 882 F. Supp. 2d 1168, 1178 (S.D. Cal. 2012) (citing *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983)). Striking is appropriate if it "will make trial less complicated or eliminate serious risks of prejudice to the moving party, delay, or confusion of the issues." *Sliger v. Prospect Mortg.*, 789 F. Supp. 2d 1212, 1216 (E.D. Cal. 2011).

"Impertinence" under Rule 12(f) speaks to the relevance of challenged allegations. "'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994). Where a movant challenges allegations as impertinent, "[a] court must deny the motion to strike if there is any doubt whether the allegations in the pleadings might be relevant in the action." *Oracle Am., Inc. v. Micron Tech., Inc.*, 817 F. Supp. 2d 1128, 1132 (N.D. Cal. 2011). Generally, then, courts grant such a motion "only where 'it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.'" *Rosales*, 882 F. Supp. 2d at 1179 (quoting *Walters v. Fid. Mortg. of Cal.*, 730 F. Supp. 2d 1185, 1196 (E.D. Cal. 2010)).

"Redundant matter is defined as including a needless repetition of allegations." *Nguyen v. CTS Elecs. Mfg. Sols. Inc.*, 301 F.R.D. 337, 342 (N.D. Cal. 2014). Thus, "courts utilize Rule 12(f) to

strike parts of complaints which are redundant to other causes of action." *Id.*; *Sorosky v. Burroughs Corp.*, 826 F.2d 794, 802 (9th Cir. 1987).

"As a rule, motions to strike are regarded with disfavor because striking is such a drastic remedy; as a result, such motions are infrequently granted." *Amini Innovations Corp. v. McFerran Home Furnishings, Inc.*, 301 F.R.D. 487, 489–90 (C.D. Cal. 2014) (citing *Freeman v. ABC Legal Servs., Inc.*, 877 F. Supp. 2d 919, 923 (N.D. Cal. 2012)). "[W]hen ruling on a motion to strike," the court accepts the challenged allegations as true and "must liberally construe" those allegations "in the light most favorable" to the non-moving pleader. *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1140 (N.D. Cal. 2010); *see, e.g.*, *Multimedia Patent Trust v. Microsoft Corp.*, 525 F. Supp. 2d 1200, 1211 (S.D. Cal. 2007) ("In determining a motion to strike, a district court must view the pleadings in the light most favorable to the pleader.").

## ANALYSIS

The parties disagree about the sufficiency of the plaintiffs' allegations supporting their § 1981 claim, which consists of (1) statistics showing that Meta relies on H-1B visa holders for 15% of its workforce compared with 0.5% for the overall workforce; (2) allegations from a complaint in which the DOJ investigated Meta for allegedly discriminating against U.S. citizens by deterring them from applying for certain positions in favor of temporary visa holders; (3) and anecdotes from the plaintiffs that they were well qualified for positions at Meta, received positive feedback at interviews, were ultimately not hired, and that, in one instance, Meta hired an H-1B visa holder instead.[39] Meta concedes that "allegations that combine statistics with historical, individual, or circumstantial evidence of discrimination" can support a plausible § 1981 pattern-or-practice claim but contests the sufficiency of the plaintiffs' allegations to establish discriminatory intent by Meta or that the plaintiffs' U.S. citizenship was a but-for cause of the alleged discrimination.[40] The plaintiffs counter that these three categories of facts are sufficient to meet their burden at this

---

[39] SAC – ECF No. 46 at 4–16 (¶¶ 14–63); Opp'n – ECF No. 59 at 16–19.

[40] Reply – ECF No. 62 at 10 (cleaned up).

United States District Court
Northern District of California

1   stage.[41]

2       Meta also moved to (1) strike the DOJ allegations from the plaintiffs' complaint because it

3   comprises the "only basis" for the plaintiffs' claim and (2) stay discovery because its motion to

4   dismiss is potentially dispositive.[42] The plaintiffs responded that their complaint relies on factual

5   allegations outside of the DOJ complaint and that discovery should not be stayed because even if

6   the court granted Meta's motion to dismiss, they could amend their complaint to cure any

7   deficiencies.[43]

8       The order denies the motions: the plaintiffs' allegations are sufficient to plead a plausible

9   § 1981 claim, the court does not strike references to DOJ allegations from a separate complaint in

10  the SAC because the plaintiffs rely on other factual allegations too, and the motion to stay

11  discovery is moot.

12

13  **1.   Failure to State a Claim**

14      Section 1981 provides in relevant part that "[a]ll persons within the jurisdiction of the United

15  States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white

16  citizens." 42 U.S.C. § 1981(a). Generally, § 1981 prohibits discrimination based on race or

17  ethnicity, but not gender, sexual orientation, religion, age, disability, or national origin. *Johnson v.*

18  *Riverside Healthcare Sys.*, 534 F.3d 1116, 1123 (9th Cir. 2008); *Fonseca v. Sysco Food Servs. of*

19  *Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004); *Sagana v. Tenorio*, 384 F.3d 731, 738 (9th Cir.

20  2004). Notwithstanding its text, § 1981 prohibits discrimination against white people. *Doe v.*

21  *Kamehameha Schs.*, 470 F.3d 827, 837 (9th Cir. 2006) (en banc). It also prohibits discrimination

22  based on alienage and against United States citizens. *Sagana*, 384 F.3d at 738–40; *Rajaram*, 105

23  F.4th at 1182 ("If noncitizens have greater rights than citizens, then the statute's guarantee is

24  violated, and an aggrieved party—here, an injured citizen—may invoke the cause of action

25

26  _____

27  [41] Opp'n – ECF No. 59 at 16.

    [42] Reply – ECF No. 62 at 18; Mot – ECF No. 56 at 5–7.

28  [43] Opp'n – ECF No. 59 at 27–29; Opp'n – ECF No. 57 at 9.

United States District Court
Northern District of California

recognized in *Johnson* to equalize the rights that 'all persons' are afforded." (citing *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975)).

To state a § 1981 claim against a private defendant, a plaintiff must allege that (1) he is a member of a racial group, (2) some contractual right with the defendant was impaired, (3) the defendant intentionally discriminated against him based on race, and (4) his race was a but-for cause of the contractual impairment. *Ray v. Am. Airlines, Inc.*, __ F. Supp. 3d __, 2024 WL 4731007, at *2 (C.D. Cal. 2024) (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020)).

The plaintiffs allege discrimination under a pattern-or-practice theory. The parties disagree about how the pattern-or-practice framework articulated by the Supreme Court in *International Brotherhood of Teamsters v. United States* affects what the plaintiffs are required to plead at this stage: Meta contends that the plaintiffs must establish discriminatory intent and but-for causation, and the plaintiffs counter that they must merely establish a pattern-or-practice claim under the *Teamsters* framework.[44] 431 U.S. 324 (1977). On this point, Meta is correct. "The Supreme Court has explicitly held that the prima facie case in the discrimination context 'is an evidentiary standard, not a pleading requirement.'" *O'Donnell v. U.S. Bancorp Equip. Fin., Inc.*, No. C10-0941 TEH, 2010 WL 2198203, at *3 (N.D. Cal. May 28, 2010) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). Thus, "an employment discrimination plaintiff need not plead a prima facie case of discrimination," but instead, "the ordinary rules for assessing the sufficiency of a complaint apply." *Id.* (quoting *Swierkiewicz*, 534 U.S. at 511, 515). Nonetheless, it has been recognized that the elements of a prima facie case "are . . . relevant to the court's analysis of the sufficiency of the complaint." *Id.* at *3. Despite the above disagreement, the parties generally agree on what the plaintiffs must plead to survive a motion to dismiss.

The parties agree that a plaintiff can establish a § 1981 claim meeting the above requirements by alleging a pattern or practice of discrimination by the defendant. A plausible pattern-or-practice claim must be based upon "more than the mere occurrence of isolated or 'accidental' or sporadic

---

[44] Opp'n – ECF No. 59 at 14–15; Reply – ECF No. 62 at 6–7.

1    discriminatory acts. It [must be] establish[ed] by a preponderance of the evidence that []

2    discrimination was the company's standard operating procedure the regular rather than the unusual

3    practice." [45] *Teamsters*, 431 U.S. at 336.

4        Courts may consider gross statistical disparities in combination with historical, individual, or

5    circumstantial evidence when assessing a pattern-or-practice claim.[46] *See id.* at 338 ("The

6    Government bolstered its statistical evidence with the testimony of individuals who recounted

7    over 40 specific instances of discrimination."). The parties also agree that a plaintiff need not

8    allege specific instances of discrimination in a pattern-or-practice claim.[47] While the parties have

9    competing views on whether the plaintiffs' burden is "heav[y]" versus "minimal," they ultimately

10   agree that the plaintiffs' allegations must demonstrate a right to relief above a speculative level to

11   survive a motion to dismiss, which is required under Rule 12(b)(6).[48]

12       Meta attacks the sufficiency of the plaintiffs' allegations in two ways. First, Meta cites cases to

13   show why the plaintiffs have not met the above burden, distinguishing the facts here from three

14   cases where courts denied motions to dismiss and analogizing it to one where the court dismissed

15   the case. Second, Meta contends that each category of the plaintiffs' evidence is insufficient to

16   support their claim. Neither argument is persuasive.

17       **1.1    Case Analogies**

18       Meta contends that the plaintiffs' case is similar to *United States v. Nobel Learning*

19   *Communities, Inc.*, where the court dismissed the government's claims of discrimination at a

20   school because the allegation that it had "instituted a policy to exclude, remove, or otherwise

21

22   ─────────────────────

     [45] Opp'n – ECF No. 59 at 14–15, 20; Reply – ECF No. 62 at 6–7 ("[C]ourts have held that to state a

23   plausible pattern-or-practice claim, plaintiffs must plead that (1) the alleged discrimination amounted
     to more than sporadic acts of discrimination, but rather the defendant's standard operating procedure

24   or the regular rather than the unusual practice, and (2) the discrimination was directed at a class of
     victims." (cleaned up) (quoting *Hill v. City of New York*, 136 F. Supp. 3d 304, 331 (E.D.N.Y. 2015)),

25   16 (saying the same regarding plausibly pleading but-for causation).

26   [46] Reply – ECF No. 62 at 10; Opp'n – ECF No. 59 at 18–19.

     [47] Reply – ECF No. 62 at 7 ("And while allegations describing discrimination against specific

27   individuals are not required, they are relevant to show a policy of intentional discrimination." (cleaned
     up) (quoting *Hill*, 136 F. Supp. 3d at 332)); Opp'n – ECF No. 59 at 20.

28   [48] Opp'n – ECF No. 59 at 15–16; Reply – ECF No. 62 at 7.

United States District Court
Northern District of California

discriminate against children with disabilities" was not substantiated by "any facts." 676 F. Supp. 2d 379, 385 (E.D. Pa. 2009). Meta argues that the plaintiffs' allegations similarly amount to a "formulaic recitation of the elements" because they rely on unsupported statements, generic statistics, and speculative and conclusory anecdotes.[49]

But the plaintiffs' complaint offers more than bare allegations, including statistical disparities that point to potential discrimination, anecdotes that they were "well qualified" for positions but routinely denied employment, and allegations investigated by the DOJ involving alleged discrimination against U.S. citizens.[50] Rather, the plaintiffs' case is more analogous to the three cases that Meta contends are distinguishable. In *Richardson v. City of New York*, the court denied a motion to dismiss based on the same categories of evidence alleged by the plaintiffs. 17-CV-9447 (JPO), 2018 WL 4682224, at *8 (S.D.N.Y. Sept. 28, 2018) (denying a motion to dismiss where the plaintiff relied on "strong statistical evidence of African Americans' underrepresentation at FDNY relative to their representation at other City agencies hiring from the same applicant pool, a sibling court's conclusion after full discovery that adequate evidence supported an inference of intentional discrimination elsewhere within FDNY, and anecdotal evidence plausibly relating individual instances of discrimination"). While the plaintiffs' anecdotes are not as substantial as those of the two other cases cited by Meta, that alone does not warrant dismissing the plaintiffs' claim. *See Hill v. City of New York*, 136 F. Supp. 3d 304, 335–37 (E.D.N.Y. 2015) (concluding that the plaintiffs "plausibly raise[d] the requisite inference of discriminatory animus based on allegations that predominantly non-minority groups . . . were not subject to the same discriminatory policies as the 911 Operators, and allegations about disparaging remarks" against the 911 Operators); *EEOC v. PBM Graphics*, 877 F. Supp. 2d 334, 341, 347 (M.D.N.C. 2012) (the plaintiffs alleged that the defendant discriminated against non-Hispanic temporary workers by giving Hispanic temporary workers more hours and rejecting non-Hispanic workers in favor of Hispanic workers with equal or less experience).

---

[49] Reply – ECF No. 62 at 9–10.

[50] *See infra* Discriminatory Intent analysis.

United States District Court
Northern District of California

In short, the above cases do not support granting Meta's motion to dismiss.

Regarding the specific elements of a § 1981 claim, the parties dispute only the intent and causation elements.

### 1.2    Discriminatory Intent

Meta points to deficiencies in the plaintiffs' allegations. First, Meta contends that the statistical allegation that H-1B visa holders comprise 15% of its workforce compared with "less than 0.5% of the U.S. workforce" is "unremarkable" because Meta "relies on highly skilled jobs in engineering and data science, [which] includes more visa holders than the U.S. workforce more broadly."[51] Meta asserts that the court should reject the plaintiffs' statistical allegations because the plaintiffs have not alleged facts tending to exclude the above alternative and the statistics are too generic and incorrectly compare the percentage of Meta H-1B visa holders to the general population rather than the applicant pool.[52]

The plaintiffs counter that (1) a "gross statistical disparity between the racial composition of the defendant's workforce and the general population" is a "telltale sign of purposeful discrimination," (2) any deficiency in methodology of statistics at this stage goes to weight, and (3) there is no requirement that statistics must always be based on the applicant pool, especially when Meta's hiring practices have tainted the pool.[53] The court does not reject the plaintiffs' statistical allegations.

"[S]tatistical analyses have served and will continue to serve an important role in cases in which the existence of discrimination is a disputed issue." *Teamsters*, 431 U.S. at 339 (cleaned up). Statistics are relevant to determining a pattern and practice claim because they "can be used to establish a general discriminatory pattern in an employer's . . . practices. Such a discriminatory

---

[51] Reply – ECF No. 62 at 10–11. Meta also compared the plaintiffs' statistics to the fact that "89% of elementary school teachers are women," arguing that "[n]o court would assume that school districts, based on that statistical allegation, are systematically discriminating against men." *Id.* at 11. But this analogy is unpersuasive because Meta has not explained how circumstances surrounding H-1B visa holders with jobs in engineering and data science are similar to those of female teachers.

[52] *Id.* at 11–12.

[53] Opp'n – ECF No. 59 at 16–18 (citing *Teamsters*, 431 U.S. at 339–40, 339 n.20).

1  pattern is probative of motive and can therefore create an inference of discriminatory intent with

2  respect to the individual employment decision at issue." *Obrey v. Johnson*, 400 F.3d 691, 694 (9th

3  Cir. 2005).

4       Here, the plaintiffs have pleaded facts outside of statistics, including anecdotes about the

5  plaintiffs' being qualified for positions yet never hired and DOJ allegations of similar

6  discrimination by Meta. These allegations tend to exclude (though not entirely) the possibility that

7  the statistical disparity between Meta's reliance on H-1B visa holders and other employers is due

8  to the technical nature of Meta's job openings. Thus, while the plaintiffs' statistical allegations do

9  not establish a plausible claim alone, they serve as one probative piece of the plaintiffs' factual

10  pleadings. *Id.* at 695 ("A statistical study may fall short of proving the plaintiff's case, but still

11  remain relevant to the issues in dispute.").

12       At the hearing, the plaintiffs stated that they have since found U.S. Census Bureau data that 40%

13  of the U.S. workforce has a bachelor's degree or greater, meaning that Meta's concentration of H-

14  1B visa holders is 15% compared to about 1% for the general workforce.[54] The plaintiffs also noted

15  that only 25% of employers of H-1B visa holders qualify as an "H-1B visa dependent employer."

16  The court is confined to the pleadings, which are sufficient to support denying the motions. That

17  said, these statistics — which relate to the statistics in the complaint — support the conclusion that

18  the case goes forward. It would not be efficient for the parties or the court to have an amendment to

19  get a better statistical basis for the claims and then have a round-two motion.

20       The cases that Meta cites in support of its argument that the plaintiffs' statistics are too general

21  to support their claim are distinguishable from this case because the courts assessed the sufficiency

22  of statistical allegations alone rather than relying on the three categories pleaded by the plaintiffs

23  here.[55] *Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63 (2d Cir. 2015) (considering the level of

24  detail necessary for statistics alone to support a claim); *Raymond v. City of New York*, 317 F.

25  Supp. 3d 746, 761 (S.D.N.Y. 2018) (same); *Alameda v. Ass'n of Soc. Work Bds.*, No. 24-CV-6156

26

27  [54] The court can judicially notice matters of public record. *Lee v. County of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001).

28  [55] Opp'n – ECF No. 59 at 22 (making this point).

*(left margin, vertical text)* United States District Court Northern District of California

(KMK), 2024 WL 4302389, at *5 (S.D.N.Y. Sept. 25, 2024) (same); *Patterson v. U.S. Cold Storage*, 1995 WL 871333, at *3 (N.D. Cal. Mar. 28, 1995) (considering only statistical allegations at the summary-judgment phase), *aff'd*, 87 F.3d 1321 (9th Cir. 1996).

Meta points to case law stating that "[d]isparate impact should always be measured against the actual pool of applicants."[56] *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 482 (9th Cir. 1983). But while statistics comparing Meta's H-1B population with its applicant pool would be stronger evidence, the plaintiffs' statistics remain probative.[57] *Teamsters*, 431 U.S. at 339–40, 339 n.20 ("Evidence of longlasting and gross disparity between the composition of a work force and that of the general population thus may be significant . . . . Considerations such as small sample size may, of course, detract from the value of such evidence and evidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants would also be relevant." (cleaned up)).

Second, Meta contends that the plaintiffs' anecdotal and factual allegations are conclusory and that they need comparator evidence because they lack "any other factual allegations supporting an inference of discriminatory intent."[58] The plaintiffs point to additional allegations in their SAC, explaining that while their anecdotes support the plausibility of a pattern or practice of discrimination, the "anecdotal accounts are not the focus" at this stage but rather "[bring] the cold numbers convincingly to life."[59] *Teamsters*, 431 U.S. at 339. The complaint contains sufficient non-conclusory allegations to survive a motion to dismiss.

The allegations that "Meta engages in a pattern or practice of discriminating" and that the plaintiffs "would have been hired absent Facebook's systematic preference for visa holders" are conclusory.[60] But the complaint contains more than conclusory statements, including anecdotes

---

[56] Mot. – ECF No. 54 at 12.

[57] Thus, the order does not address plaintiffs' contention that the applicant pool is tainted. Opp'n – ECF No. 59 at 17.

[58] Reply – ECF No. 62 at 14.

[59] Opp'n – ECF No. 59 at 19.

[60] Reply – ECF No. 62 at 13; SAC – ECF No. 46 at 9 (¶ 32), 14 (¶ 55), 16 (¶ 63).

1    that the plaintiffs were not hired despite their qualifications, allegations resulting from a DOJ

2    investigation of similar alleged discrimination, and statistics showing that the number of H-1B

3    visa holders that Meta hires has increased since 2013 and that Meta relies on 15% H-1B holders

4    versus 0.5% for other employers.[61] *See Sypherd v. Lazy Dog Rests., LLC*, No. EDCV 20-921 JGB

5    (KKx), 2020 WL 5846481, *12–13 (C.D. Cal. July 24, 2020) (finding that the plaintiffs plausibly

6    pleaded an age-discrimination claim by alleging that the employer hired a small proportion of

7    employees from the protected age group than of such individuals in the working population and

8    that "(1) no over-forty workers were observed working at one of Defendant's restaurants, (2) at

9    least fourteen over-forty workers applied but were not hired, and (3) each of the three Plaintiffs

10   were qualified but not hired while less-qualified, younger workers were hired"). These allegations

11   support the plaintiffs' overall complaint that they were not hired because Meta favors H-1B visa

12   holders.

13    Because the plaintiffs' complaint relies on several categories of allegations, the cases Meta

14   cited in support of the need of comparator evidence are inapplicable. *Krecz v. Google, Inc.*, No.

15   2:18-cv-01585-JAM-CKD PS, 2019 WL 415048, at *4 (E.D. Cal. Feb. 1, 2019) ("[The plaintiff]

16   makes no mention of the national origins of those persons who allegedly filled the positions he

17   sought." (cleaned up)), *adopting R.&R.*, 2019 WL 13398338 (E.D. Cal. 2019); *Ma v. S.F. Estuary

18   Inst.*, No. 24-cv-05060-JCS, 2024 WL 2113862, at *16 (N.D. Cal. May 8, 2024) ("Plaintiff has not

19   alleged specific facts about the age, race or national origin of the individual who was hired for the

20   job for which she applied and was not hired.").

21    Meta also asserts that the plaintiffs' allegations about wage theft as a potential motivation for

22   Meta to discriminate against U.S. citizens are unsupported, but the plaintiffs need only plead that

23   the alleged discriminatory practice was the standard operating procedure and that it was aimed at a

24   protected group.[62] *Teamsters*, 431 U.S. at 336. The plaintiffs have done so.

25

26

27   ---
     [61] Opp'n – ECF No. 59 at 19, 22–23; SAC – ECF No. 46 at 4–16 (¶¶ 14–63).

28   [62] Opp'n – ECF No. 59 at 14–15, 20; Reply – ECF No. 62 at 13.

United States District Court
Northern District of California

As with the statistical allegations, the court finds that plaintiffs' anecdotal and factual allegations provide at least some support for their claim.

Third, Meta contends that the plaintiffs' allegations citing the DOJ complaint against Meta do not support the plaintiffs' claim because the DOJ allegations were for different hiring practices that occurred years before the plaintiffs applied for jobs with Meta, and the case was settled without discovery or a judicial decision.[63] The plaintiffs respond that (1) the DOJ allegations are relevant because they relate to discrimination against U.S. citizens (even if the exact practice alleged is not identical), (2) the timing of the DOJ complaint is not an issue because they allege that Meta has continued to discriminate against U.S. citizens, and (3) in any event, Meta has not cited authority suggesting that the DOJ allegations can't be considered at all.[64]

The DOJ allegations support the plaintiffs' claims. Meta's citation to *Richardson* does provide examples of prior lawsuits that another federal district court found probative of discriminatory intent, but it does not dictate that the DOJ complaint here is not.[65] The conduct alleged in the DOJ complaint is similar: Meta favored non-citizens over U.S. citizens during its hiring process.

In sum, the plaintiffs have offered three types of allegations that together support their burden of plausibly pleading discriminatory intent.

### 1.3   Causation

Meta contends that the plaintiffs have failed to show but-for causation by pointing to its arguments for discriminatory intent.[66] But the parties agree that a plaintiff can establish but-for causation in the same manner as discriminatory intent: by plausibly alleging that discrimination was the defendant's standard operating procedure or the regular practice rather than the unusual practice and the discrimination was directed at a class of victims.[67] Thus, for the same reasons

---

[63] Reply – ECF No. 62 at 14–15.

[64] Opp'n – ECF No. 59 at 18–19.

[65] Reply – ECF No. 62 at 15.

[66] *Id.* at 16.

[67] *Id.*; Opp'n – ECF No. 59 at 20.

discussed above, the court finds that the plaintiffs have plausibly pleaded but-for causation in a pattern-or-practice claim and need not show causation on an individual basis.

**2.  Motion to Strike**

Meta contends that the court should strike references to the DOJ complaint from the plaintiffs' complaint because (1) the plaintiffs have not offered their "own independently acquired facts in support of their claim" and (2) the DOJ allegations "are unrelated to the hiring practices at issue here."[68] The plaintiffs counter that they have alleged their own independent facts, the allegations of discrimination in the DOJ complaint are relevant to their claim, and Meta made no argument addressing the standard at issue — that the material is "redundant, immaterial, impertinent, or scandalous."[69]

The plaintiffs are correct: their complaint relies on more than the DOJ allegations, and allegations that Meta favored non-citizen employees in another context are relevant to the plaintiffs' claim. The court finds that none of the material that Meta seeks to strike is "redundant, immaterial, impertinent, or scandalous."

**CONCLUSION**

The court denies Meta's motions to dismiss and strike. The court denies Meta's motion to stay discovery as moot. This disposes of ECF Nos. 54 and 56.

**IT IS SO ORDERED.**

Dated: February 25, 2025

_____
LAUREL BEELER
United States Magistrate Judge

United States District Court
Northern District of California

[68] Reply – ECF No. 62 at 18–19.
[69] Opp'n – ECF No. 59 at 27–29.

ORDER – No. 22-cv-02920-LB                    22