Daniel Low (Bar #218387)
Daniel Kotchen (*pro hac vice*)
Lindsey Grunert (*pro hac vice*)
**KOTCHEN & LOW LLP**
1918 New Hampshire Avenue NW
Washington, DC 20009
Telephone: (202) 471-1995
Fax: (202) 280-1128
Email: dlow@kotchen.com

*Attorney for Plaintiffs and Putative Class*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| PURUSHOTHAMAN RAJARAM, EKTA BHATIA, QUN WANG, MICHAEL BROWNE, and WILLIAM AUSTIN WEBB, | Case No. 3:22-cv-02920-LB |
| Plaintiffs, | **THIRD AMENDED COMPLAINT** |
| v. | FOR EMPLOYMENT DISCRIMINATION |
| META PLATFORMS, INC., | CLASS ACTION |
| Defendant. | JURY TRIAL DEMANDED |

Plaintiffs Purushothaman Rajaram, Ekta Bhatia, Qun Wang, Michael Browne, and William Austin Webb bring this action on behalf of themselves and a class of similarly situated individuals to remedy pervasive, ongoing citizenship discrimination by Defendant Meta Platforms, Inc.[1] (hereafter referred to as either "Facebook" or "Meta") and allege as follows:

---

[1] Facebook, Inc. changed its corporate name from Facebook, Inc. to Meta Platforms, Inc. in October 2021, but is still commonly known as Facebook. *See* Meta Platforms, Inc. Form 10-K at 3, *available at* https://bit.ly/3LxDXMt.

## NATURE OF THE ACTION

1.      Meta is an American technology conglomerate that builds products designed to enable users to connect with each other through mobile and in-home devices, computers, and virtual reality headsets. Its most popular products include Facebook (a social networking platform), Instagram (a photo and videosharing platform), Messenger (a messaging application), WhatsApp (a secured messaging application), and Meta Quests (which designs virtual reality products). Meta employs around 67,300 individuals globally, and as of 2021 (the most recent EEO-1 data available), 56,034 of its employees were located in the United States.

2.      When hiring for U.S. positions, Meta considers United States citizens, lawful permanent residents (e.g., green card holders), and foreign citizens with proper work permits (e.g., H-1B or L-1 visa holders). But while visa holders make up just a fraction of the United States labor market, Meta prefers to hire visa-dependent, non-citizen workers for certain U.S. positions, as it can pay these employees less than American, non-visa workers performing the same work. The Department of Justice has sued Facebook for this very practice and entered into a settlement agreement with Facebook in October 2021 to resolve the claims.[2] As of mid-October 2024, the terms of the settlement agreement are no longer in effect (the term of the Agreement was 3 years). As such, Facebook is no longer required to comply with the settlement agreement's terms requirements for PERM-related positions, which included the requirement that all such job postings be advertised on Facebook's career website in the same manner and format as other roles, that Facebook accept electronic applications for all PERM-related positions via its career website, and that all applicants to PERM-related job positions be entered into Facebook's recruiting system, allowing those candidates to be identified, considered, and hired by Facebook's recruiting team for other matching roles and opportunities.

3.      Meta's employment practices violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981"). Plaintiffs seek, on their own behalf, and on behalf of a class of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive

---

[2] *See* Settlement Agreement at 2, *available at* https://bit.ly/3nxZifd.

damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress Meta's pervasive pattern and practice of citizenship discrimination.

**PARTIES**

4.      Plaintiff Purushothaman Rajaram is a naturalized United States citizen, and is a resident of Pennsylvania.

5.      Plaintiff Ekta Bhatia is a naturalized United States citizen, and is a resident of California.

6.      Plaintiff Qun "James" Wang is United States citizen, and is a resident of Georgia.

7.      Plaintiff Michael Browne is a dual citizen of both the United States and the United Kingdom, and is a resident of Washington State.

8.      Plaintiff William Austin Webb is as United States citizen, and is a resident of New Hampshire.

9.      Plaintiffs are members of a protected class, as recognized by § 1981.

10.     Defendant Meta Platforms, Inc. is an American social networking and technology company. It develops products which allow users to share information, photographs, messages, and videos with other users. Facebook, Inc. was created in 2004, and changed its corporate name to Meta Platforms, Inc. in 2021. It is incorporated in Delaware and maintains its corporate headquarters in Menlo Park, California.

**JURISDICTION**

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1981(a).

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

13.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest

and costs, and involves at least one class member who is a citizen of a state and is brought against a corporation that is a citizen of a different state.

14.    This Court has personal jurisdiction over Meta because it engages in continuous and systematic business contacts within the State of California and maintains a substantial physical presence in this State, including the operation of its corporate headquarters and more than ten offices. Additionally, as described below, Plaintiffs' claims arise, in part, out of Meta's activities in California.

## VENUE AND INTRADISTRICT ASSIGNMENT

15.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)-(c) because Meta resides in this District, conducts business in this District, and engaged in discriminatory conduct in this District. Additionally, Meta engages in continuous and systematic business contacts within this District, and maintains a substantial physical presence in this District, including the operation of its headquarters in Menlo Park, California (where almost one-third of its global employees work) and offices in Burlingame, Foster City, Fremont, Mountain View, San Francisco, Santa Clara, Sausalito, and Sunnyvale. Further, a substantial part of the events giving rise this action occurred in this District. For example, Mr. Rajaram was contacted by a Facebook recruiter who was located in Menlo Park, California, and Mr. Rajaram subsequently discussed and applied to an open position with Facebook through that recruiter. Mr. Rajaram has also applied to other PLM roles with Facebook located in Menlo Park, California, but was not hired. In addition, both Ms. Bhatia and Mr. Wang applied for positions with Meta where, if hired, they would have worked from Meta's Menlo Park or Sunnyvale offices in California. Further, the Data Scientist Manager role Mr. Browne applied to with Meta was to be based in Menlo Park, California. And when Mr. Webb worked for Meta as a contractual worker, while he worked remotely from New Hampshire, much of his team was based in Fremont, California. As such, assignment in this Division is proper pursuant to Civil L.R. 3-2(c) because a substantial part of the events giving rise to this matter's claims occurred in this Division.

THIRD AMENDED COMPLAINT

## STATEMENT OF FACTS

*Overview of Meta's Business Model and Discriminatory Scheme*

16.     Meta has approximately 42 offices in the United States and employs over 56,000 employees domestically. The company earned over $134 billion in revenue in the past fiscal year, with a net income of $39.1 billion. Meta derives approximately 45% of its revenue from the United States and Canada. Meta has grown and expanded its U.S. operations over the years through hiring.

17.     Hiring employees increases costs, as it adds individuals to payroll, and there are additional costs associated with recruiting, hiring, and onboarding new employees. In order to reduce costs, Meta prefers to hire non-citizen visa workers for certain positions—namely, H-1B visa workers. *See* Compl. ¶¶ 2-4, *United States of America v. Facebook, Inc.*, OCAHO Case No. 2021B00007 (Dec. 3, 2020), *available at* https://bit.ly/3rMJzbF.

18.     H-1B visas are intended to bring foreign workers to the United States to perform services in specialty occupations when there are insufficient workers in the U.S. to perform a specific job. *See* 8 C.F.R. § 214.2(h)(1)(ii)(B); 8 C.F.R. § 214(i)(1). By law, H-1B visa workers must be paid by their employer at least as much as other individuals with similar experience and qualifications for the specific employment in question. *See* 20 C.F.R. § 655.731(a). Thus, the only reason Meta would choose to hire and relegate certain positions to visa holders is to pay them less than American counterparts, an unlawful practice that is known in the industry as "wage theft." If Meta in fact paid its visa workers the same as it paid American workers, it would have every incentive to hire, for all positions, the most qualified individual (regardless of his or her visa status or citizenship).

19.     Meta hires visa workers in two ways. First, Meta hires visa workers directly from the labor market, utilizing its own recruiters and job postings to attract candidates. Meta must sponsor visas for these employees to allow them to legally work in the U.S., and Meta therefore retains considerable control over these employees. Over the past ten years, Facebook has secured over 20,000 H-1B visas (including fresh visas, visa extensions, and visa amendments) for its U.S. workforce. Facebook, and now Meta, is an H-1B visa dependent employer, meaning that 15% or more of Meta's U.S. workforce is on an H-1B visa (compared to 0.37% of the overall U.S. workforce and 0.95% of

THIRD AMENDED COMPLAINT

the overall U.S. workforce with at least a bachelor's degree).[3] Of employers who utilize H-1B visas, less than one in four is categorized as visa dependent.[4] And as Meta's U.S. workforce continues to grow, so does its reliance on H-1B visa workers, as indicated by the increased number of H-1B visa approvals below.

| Year | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| H-1B Visa Approvals[5] | 412 | 527 | 894 | 1,107 | 1,566 | 2,467 | 3,552 | 4,408 | 5,100 |

The vast majority of these visas are secured for employees who will perform software engineer roles in the United States. *See id.* A large numbers of H-1B visas are also secured for Meta's Research Scientists, Data Scientists, Data Engineers, and Engineering Managers. *See id.*

20.    Second, Meta contracts with third party vendors such as Infosys, Accenture, and Crystal Equation Corporation that provide it with visa workers who work out of one of Meta's 42 U.S. offices. While the consulting or contracting companies sponsor visas for these employees, Meta interviews them, maintains control over their hiring and termination from Meta projects, and supervises and directs their day-to-day activities and assignments.

---

[3] As of September 2019, there were approximately 583,420 H-1B visa holders in the United States. *See* Priyanka Sangani, US has just over 580,000 H-1B holders, says USCIS, THE ECONOMIC TIMES (June 29, 2020), https://bit.ly/3txmo75. The total U.S. workforce in 2019 was approximately 157.54 million. *See* Employment in the United States from 2013 to 2023, STATISTA (last accessed Feb. 25, 2025), *available at* https://www.statista.com/statistics/269959/employment-in-the-united-states/. Approximately 38.9% of the U.S. workforce held at least a bachelor's degree in 2016, though that percentage has presumably increased. *See* Vernon Brunage, Jr., Profile Of The Labor Force By Educational Attainment at 2, BUREAU OF LABOR STATISTICS (August 2017), https://bit.ly/4hTJOfz (reporting that in 2016, 24.2% of the labor force had only a bachelor's degree, and 14.7% had an advanced degree, or 38.9% with a bachelor's degree or higher). Thus, approximately 0.37% of the workforce in 2019 consisted of H-1B visa holders (i.e., 583,420 ÷ 157.54 million), and approximately 0.95% of the workforce in 2019 with at least a bachelor's degree consisted of H-1B visa holders (583,420 ÷ (157.54 million x 38.9%)).

[4] *See* Performance Data, LCA_Disclosure_Data_FY2024_Q1.xlsx, DEPARTMENT OF LABOR (last accessed Feb. 25, 2025), *available at* https://www.dol.gov/agencies/eta/foreign-labor/performance.

[5] *See* H-1B Employer Data Hub Files, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (last accessed Aug. 8, 2024), *available at* http://bit.ly/2OpEyr2.

THIRD AMENDED COMPLAINT

21.    Meta's preference for hiring and employing visa workers over U.S. citizens is no secret. In fact, in December 2018, the Immigrant and Employee Rights Section ("IER") within the Civil Rights Division of the U.S. Department of Justice launched an investigation into Facebook's recruitment and hiring practices, focusing specifically on whether Facebook engaged in unfair recruitment and hiring practices based on citizenship or immigration status in violation of 8 U.S.C. § 1324b(a)(1). *See* Compl. ¶ 9, *United States of America v. Facebook, Inc.*, OCAHO Case No. 2021B00007 (Dec. 3, 2020), *available at* https://bit.ly/3rMJzbF. Following an almost two-year investigation, on October 9, 2020, the IER notified Facebook that it had "found reasonable cause to believe that Facebook had engaged in a pattern or practice of unfair immigration-related employment practices violating 8 U.S.C. § 1324b(a)(1)," which prohibits discrimination based on an individual's citizenship status. *Id.* ¶ 10.

22.    The Department of Justice subsequently filed a complaint against Facebook on December 3, 2020, alleging that Facebook intentionally discriminates against U.S. workers because of their citizenship or immigration status by failing to recruit, consider, or hire these workers for permanent positions that it earmarks for the company's visa holders. *Id.* ¶¶ 2-3. The complaint alleges that from at least January 1, 2018 to at least September 18, 2019, "Facebook's standard operating procedure was to decline to hire . . . U.S. worker[s] for [2,606] PERM-related position[s]," despite the applicants' qualifications, and to instead fill these vacancies only with PERM beneficiaries (Facebook employees who were temporary visa holders seeking permanent positions within Facebook and lawful permanent residency in the U.S.). *Id.* ¶¶ 42, 48-49. Facebook took active steps to discourage U.S. workers from applying to the positions reserved for its visa holders, including by failing to advertise the open positions on its website, refusing to accept online applications for the roles, and requiring all interested candidates to mail in copies of their applications. *Id.* ¶ 2. Through this practice, Facebook was able to ensure that its temporary visa holders secured permanent positions

through the permanent labor certification process, allowing them to remain in the U.S. beyond the 6-year period afforded by their H-1B visas. *Id.* ¶¶ 2, 17.

23.    In October 2021, Facebook and the Department of Justice entered into a settlement agreement under which Facebook is required to pay $4,750,000 to the United States Treasury in civil penalties and $9,500,000 to a Settlement Fund for potential victims of Facebook's discrimination. *See* Settlement Agreement at 2, *available at* https://bit.ly/3nxZifd. In addition to agreeing not to discriminate in hiring and recruitment on the basis of citizenship or immigration status, Facebook also agreed to make changes to its recruitment process in connection with its PERM applications, including posting all PERM-related positions on Facebook's Career website in the same manner as other non-PERM roles, accepting electronic applications for PERM-related positions, entering all applicants to PERM-related positions into Facebook's recruiting system, and only rejecting a U.S. worker for the position for lawful, job-related reasons. *See id.* at 2-3.

24.    Facebook's 2013 to 2023 PERM applications figures are as follows, showing again its increased reliance on visa workers.

| Year | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|------|------|------|------|------|------|------|------|
| PERM Applications[6] | 95 | 256 | 419 | 732 | 692 | 1,443 | 1,481 | 1,547 | 320 | 909 | 2,046[7] |

25.    Like Facebook/Meta's H-1B visa applications, its PERM applications are mostly filed for Software Engineers, with a high number of applications also filed for Research Scientists, Data Scientists, Data Engineers, and Engineering Managers.[8]

---

[6] *See* Performance Data, U.S. DEPARTMENT OF LABOR (last accessed Aug. 8, 2024), *available at* https://bit.ly/3HP5KpF.

[7] In 2023, Meta Platforms, Inc. filed 371 perm applications, which is not reflected in this figure.

[8] *See id.*

THIRD AMENDED COMPLAINT

*Plaintiff Rajaram's Experiences*

26.    Mr. Rajaram is an experienced and highly skilled information technology professional with almost twenty years of experience in solution architecting and delivering enterprise Product Lifecycle Management ("PLM") software solutions to Fortune 500 companies. Mr. Rajaram holds a Bachelor of Engineering degree from Madras University in Chennai and a Diploma in Mechanical Engineering from the Directorate of Technical Education in Chennai. Throughout the course of his career, he has developed an array of technical skills, including in PLM administration, implementation, integration, and support, project and vendor management, solution architecture, requirements gathering, business process mapping, and data migration. From June 2014 forward, Mr. Rajaram has worked as an independent PLM Technical Consultant servicing aerospace, energy, and technology customers (among others).

27.    Mr. Rajaram was considered for employment with Facebook on more than four occasions, but Facebook failed to hire him each time because of the company's systematic and continuous discriminatory scheme.

28.    <u>First</u>. In May 2020, Mr. Rajaram was contacted via WhatsApp by Prashanth Sadasivaiah, an employee of Infosys Limited, regarding a PLM architect position with Facebook. Infosys Limited is a third party vendor with whom Facebook contracts to hire employees to perform IT work. Mr. Rajaram expressed interest in the position and submitted a copy of his resume, which listed his citizenship status as a naturalized U.S. citizen (the same is also mentioned on his LinkedIn profile page).

29.    Mr. Rajaram was then interviewed by three Infosys employees, Sadasivaiah J. Moorthy, and Aravind Tungaturi. The video interview took place via Skype on May 31, 2020. Mr. Rajaram performed well during the interview and received positive feedback from his interviewers. He was told he was the "right guy" and "perfect" for the role.

30.    On June 1, 2020 Mr. Rajaram received a telephone call from Pradeep Kulkarni, the Infosys client partner for Facebook, asking whether Mr. Rajaram would be available in approximately thirty minutes to interview with Facebook employee Rajesh Pralayakaveri regarding the PLM

THIRD AMENDED COMPLAINT

architect role so that Facebook could make a hiring decision. Later that evening, Mr. Rajaram underwent a telephone interview with Mr. Pralayakaveri, whom Mr. Rajaram understands to be working for Facebook in the U.S. on an H-1B visa. Mr. Pralayakaveri was a junior employee, which was evident by his questioning of Mr. Rajaram. Despite performing well in his interviews and being well-qualified for the role, Mr. Rajaram was not hired by Facebook.

31.    Second. On June 19, 2020, Bobb Omel, a PLM Analyst at Facebook, referred Mr. Rajaram for a full-time position with the company. Prior to this referral, Mr. Rajaram shared a copy of his resume with Mr. Omel, which notes that he is a naturalized U.S. citizen. Mr. Rajaram was subsequently contacted by Khaled Mansour, a Technical Sourcer for Facebook on June 23 who worked out of Facebook's Menlo Park, California location. Mr. Rajaram discussed the PLM Analyst position with Mr. Mansour on June 29 for approximately 45 minutes to 1 hour. During that time, Mr. Rajaram detailed his experience in the PLM field. Mr. Mansour stated that Facebook was very interested in Mr. Rajaram's candidacy and that Mr. Mansour would present him to the team that was hiring for the role. However, on July 6, Mr. Mansour informed Mr. Rajaram that "the team decided not to move forward with the next steps" and Facebook did not hire him for the PLM Analyst role. No further explanation was provided for Facebook's rejection of Mr. Rajaram's candidacy. On information and belief, Facebook staffed the role with an H-1B visa holder.

32.    Third and Fourth. On March 10, 2022 and March 22, 2022, Mr. Rajaram applied to Application Manager, PLM positions with Facebook on its career website. Mr. Rajaram understood these to be remote roles. As part of his applications, he submitted online a copy of his resume which states that he is a naturalized U.S. citizen. Despite being well-qualified for the roles, Mr. Rajaram received no response from Facebook, and was not interviewed or hired for the Application Manager, PLM roles.

33.    Mr. Rajaram also applied to PLM Manager, PLM Project Manager, and PLM Architect roles with Facebook over the past few years. These positions were located in Menlo Park, California and Austin, Texas. However, Mr. Rajaram never received a response from Facebook to his online applications, and he was not hired for these roles.

34.     In each instance, Facebook did not hire Mr. Rajaram because of his citizenship, and Mr. Rajaram would have been hired absent Facebook's systematic preference for visa holders in hiring for certain U.S. positions. Mr. Rajaram was a victim of Facebook's (and now Meta's) ongoing discriminatory scheme whereby he was not hired for permanent positions within the company that Facebook had earmarked for its visa holders (the very same conduct at issue in the DOJ's multi-year investigation of Facebook, resulting in a complaint being filed against Facebook (a lawsuit that ultimately settled)). Mr. Rajaram was also foreclosed from applying to other positions with Meta that matched his skillset which Meta did not advertise on its career website—the location where Mr. Rajaram typically looks for open roles with Meta, and instead advertised only in more obscure locations, such as in newspapers.

*Plaintiff Bhatia's Experiences*

35.     Ms. Bhatia is a Senior Software Engineer with over four years of professional experience in the IT industry. She holds a Bachelor of Science degree in Computer Science from San Francisco State University and completed a Web Development Bootcamp through Udemy focusing on frontend and backend development. Ms. Bhatia has a wide array of skills, which include the ability to program in a number of languages (including, for example, JavaScript, TypeScript, Java, C++, React, SQL, and HTML), and experience in multiple software development frameworks and libraries. Over the past four years, Ms. Bhatia has held a number of software engineering roles, working most recently as a Senior Software Engineer for Goldman Sachs where she developed websites and applications, analyzed and improved site speed, and tested and delivered codes.

36.     Between 2022 and 2024, Ms. Bhatia applied to at least seven roles with Meta. Ms. Bhatia was well-qualified for each of the roles, but Meta failed to hire her because of the company's systematic and continuous discriminatory scheme.

37.     First. On March 24, 2022, Ms. Bhatia received and email from Heather Teagle, Technical Sourcer for Meta, stating that Ms. Teagle was impressed with Ms. Bhatia's academic success at San Francisco State University and asking whether she was interested in exploring a career

with Meta. Ms. Teagle's email noted that she was currently hiring for Software Engineer – Product and Software Engineer – Infrastructure roles.

38.    Ms. Bhatia then submitted an application online for the Software Engineer – Product role. As part of the online application, Ms. Bhatia indicated that she did not require sponsorship to work in the United States. Ms. Bhatia also submitted a copy of her resume with the application, which noted at the top of the document that she is a U.S. citizen.

39.    On April 14, 2022, Ms. Bhatia had a telephone call with Ms. Teagle, and expressed her interest in being considered for a Software Engineer – Product role. Following that call, Ms. Teagle sent Ms. Bhatia a number of emails, including a request that she complete a "U.S. Work Authorization form." Ms. Bhatia completed that information on Meta's website, confirming that she did not require sponsorship to work in the United States. Ms. Bhatia also received an email asking for her to provide her availability for an interview in May, which Ms. Bhatia provided.

40.    Ms. Bhatia was then scheduled for a "1 hour Bluejeans Screening Interview" with Meta on May 9, 2022. The interview was to proceed via video conference, and Ms. Bhatia received confirmation of the interview on April 14, 2022. However, one week later, on April 21, 2022, Ms. Bhatia received an email from Ms. Teagle, informing her that her technical interview was being canceled as Meta had "filled all existing positions that match [Ms. Bhatia's] experience and qualifications for th[e] role." Ms. Teagle's email noted that there were "three open teams hiring for engineers like [Ms. Bhatia,]"—Enterprise Engineering, Business Engineering, and Production Engineering, yet Ms. Teagle did not refer Ms. Bhatia to any of those three teams, and Ms. Bhatia was not hired by Meta for the Software Engineer – Product role.

41.    Second. On June 24, 2023, Ms. Bhatia applied to a Software Engineer, Product – Generative AI role with Meta. As part of that job application, Ms. Bhatia submitted a copy of her resume to Meta which noted at the top of the document that she is a U.S. citizen.

42.    Three months later, on September 20, 2023, Ms. Bhatia received an email from Ledonia Davis, a Technical Sourcing Recruiter for Meta. In her email, Ms. Davis asked Ms. Bhatia to schedule call with the recruiting team at Meta if she was amenable to potentially relocating to

THIRD AMENDED COMPLAINT

Seattle, the Bay Area (California), or New York for the role, as the location strategy for hiring had adjusted for the position Ms. Bhatia applied to in June. Ms. Bhatia was open to relocation, particularly to the Bay Area, and scheduled a call with Ms. Davis on September 27, 2023. After that call, Ms. Bhatia was advanced to the next round in the interview process and was scheduled for a 45 minute "Bluejeans Screening Interview" in mid-October 2023.

43.    Prior to that interview, Ms. Bhatia received an email from Meta asking her to complete a "required U.S. Work Authorization form." Ms. Bhatia completed the form, confirming that she did not require sponsorship from Meta to work in the United States.

44.    Ms. Bhatia performed well during her October 2023 technical interview, and anticipated being advanced to the next round of interviews, given that she had written the code requested by her interviewer correctly. A week after her interview, Ms. Bhatia emailed Ms. Davis, thanking her for the opportunity to interview with the company asking for Meta's feedback. The following day, on October 26, 2023, Ms. Davis emailed Mr. Bhatia, informing her that the "team ha[d] decided not to move forward to next steps for the Software Engineer role." Ms. Davis stated that while Meta's "general guideline is not to share specific feedback," "because this was a tech/analysis [interview], it was likely that [Meta] did not receive strong enough signals in the areas [it] hoped for."

45.    <u>Third</u>. On October 13, 2023, Ms. Bhatia applied for a Software Engineer, Front End role with Meta online. Ms. Bhatia again provided Meta with a copy of her resume, listing her status as a U.S. citizen. Apart from an email from Meta confirming her application, Ms. Bhatia received no communication from Meta regarding this role, and was not interviewed, nor hired for it.

46.    <u>Fourth, Fifth, and Sixth</u>. On January 5, 2024, Ms. Bhatia applied to two roles with Meta—a Front End Data Science Developer role and a Software Engineer, Front End role. On January 8, 2024, Ms. Bhatia applied to a Business Engineer role with Meta. With each application, Ms. Bhatia again submitted a copy of her resume, listing her status as a U.S. citizen. However, Ms. Bhatia was not interviewed, nor hired, for any of these three roles.

47.     <u>Seventh</u>. On January 11, 2024, Ms. Bhatia applied to a Software Engineer, Product role with Meta online. With her application, she again submitted a copy of her resume, which listed her status as a U.S. citizen. If hired for the role, Ms. Bhatia would have worked from either Meta's Menlo Park or Sunnyvale, California location.

48.     That same day, Ms. Bhatia was contacted by Gretchen Smith, a Recruitment Screening Specialist for Meta who works remotely for the company from California. Ms. Bhatia understands that Ms. Smith called her because she had recently received a recommendation from a Meta employee who was familiar with her skill set and experience. During their call, Ms. Bhatia confirmed her interest in a role with Meta.

49.     Ms. Bhatia then received two emails from Meta: (1) an email requesting that she complete the "required U.S. work authorization form," and (2) an email asking her to submit her availability for an interview for the Software Engineer, Product role. Ms. Bhatia completed the U.S. work authorization form online, confirming that she did not require authorization to work in the United States, and was scheduled for a technical interview with Meta on January 12, 2024 to take place via videoconference.

50.     Ms. Bhatia performed well in her technical interview, and was informed on January 24, 2024 by Ms. Smith that she was moving to the next round of interviews with Meta referred to as a "Bluejeans Full Interview Loop" (four 45-minute interviews with Meta, meeting with a number of engineers from different teams). These interviews were to include coding, design, and behavioral assessments.

51.     Ms. Smith then connected Ms. Bhatia with Reece Lourdes, SWE Recruiting for Meta, who would serve as her main point of contact through the remainder of the interview process. Ms. Bhatia then had a call with Mr. Lourdes on January 31, 2024 in advance of her next round of interviews, which were ultimately scheduled for early March.

52.     In March 2024, Ms. Bhatia completed the full-loop of interviews with Meta via videoconference.  Ms. Bhatia performed well during her coding, system design, and behavioral

interviews, solving the coding problems correctly and receiving positive feedback from her system design interviewer.

53.    On March 13, 2024, Mr. Lourdes emailed Ms. Bhatia, asking how the full-loop of interviews went, and noting that he should have collective feedback from her interviews shortly and would share an update. Ms. Bhatia informed Mr. Lourdes that the interviews went well and that she enjoyed meeting everyone and learning more about their experience working for Meta.

54.    The following day, Mr. Lourdes emailed Ms. Bhatia, informing her that "[t]he collective feedback was in most areas positive, in particular the design interview – good work!" He stated that he would next take Ms. Bhatia's candidate packet to a review session—attended by Mr. Lourdes and other hiring peers—and that he would recommend Ms. Bhatia's candidacy proceed to the next steps with Meta. Mr. Lourdes stated that the review session team would "look at the feedback [from Ms. Bhatia's interviews] in its entirety and make[] a data driven decision."

55.    Ms. Bhatia's candidate packet was scheduled to be reviewed by Meta on Tuesday afternoon, March 19, 2024.

56.    On March 19, 2024, at 2:36 p.m., Ms. Bhatia received an email from Mr. Lourdes, informing Ms. Bhatia that the hiring managers decided not to move forward with her application, and that she had been rejected by Meta. In his email, Mr. Lourdes noted that Ms. Bhatia "performed well on parts of the interview; however, feedback was not quite strong enough to make it through to the next steps." Ms. Bhatia was told that she could apply again in a year, following "the 12-month interview cool off period."

57.    Like Mr. Rajaram, Meta did not hire Ms. Bhatia because of her citizenship, and Ms. Bhatia would have been hired absent Meta's systematic preference for visa holders in hiring for certain U.S. positions. Ms. Bhatia is now precluded from applying to Meta until 2025, per its "12-month interview cool off period." Ms. Bhatia was also a victim of Meta's ongoing discriminatory scheme whereby she was not hired for permanent positions within the company that Meta had earmarked for its visa holders (the very same conduct at issue in the DOJ's multi-year investigation

THIRD AMENDED COMPLAINT

of Facebook, resulting in a complaint being filed against Facebook (a lawsuit that ultimately settled)). And Ms. Bhatia was foreclosed from applying to other positions with Meta that matched her skillset which Meta did not advertise on its career website—the location where Ms. Bhatia typically looks for open roles with Meta, and instead advertised only in more obscure locations, such as in newspapers.

*Plaintiff Wang's Experiences*

58.    Mr. Wang is an experienced Data Scientist with over fifteen years of experience as a data scientist, manager, and consultant. He holds a Bachelor's degree in Applied Math, a Master's degree in Engineering, and a Ph.D. in Statistics. Mr. Wang specializes in Python/SQL/R/SAS programming and has management/project lead experience in the Healthcare Insurance, P&C Insurance, Financial/Marketing, Risk Management, and Consumer Packaged Goods industries. He has repeatedly served in leadership roles overseeing and performing projects that address stakeholder questions and concerns. Mr. Wang currently works as a Senior Business Information Consultant (Data Scientist) in the healthcare industry.

59.    From 2023 forward, Mr. Wang has applied to at least nine roles with Meta on the company's website and on the State of California website, known as CalJOBS. However, despite Mr. Wang's strong qualifications for the Data Scientist roles, he was not interviewed nor hired by Meta because of the company's systematic and continuous discriminatory scheme.

60.    First. On January 24, 2024, Mr. Wang applied to a Data Scientist (Instagram) role on Meta's career website for a position located in Menlo Park, California. The role required 36 months of experience as a data scientist based on the applicant's educational background that Mr. Wang had. In connection with his application, Mr. Wang submitted to Meta a copy of his resume, which lists his status as a U.S. citizen. Other than receiving an email from Meta acknowledging its receipt of Mr.

Wang's application, Mr. Wang received no further contact from Meta and was not interviewed, nor hired for the role.

61.   <u>Second</u>. On May 6, 2024, Mr. Wang applied to a Data Scientist, GBG Data Science role on Meta's career website. If hired, Mr. Wang would have worked out of Meta's Menlo Park, CA, Austin, TX, or New York, NY offices. With this application, Mr. Wang again submitted a copy of his resume listing his citizenship status. Mr. Wang was well-qualified or the role, given his extensive background as a data scientist. Mr. Wang also met the "Preferred Qualifications" for the role, which included an advanced degree in an analytical field such as engineering, mathematics, or statistics (Mr. Wang holds a Master's degree in Engineering and a Ph.D. in Statistics). Like with his January 24, 2024 application, other than receiving an email from Meta acknowledging its receipt of Mr. Wang's application, Mr. Wang received no further contact from Meta and was not interviewed, nor hired for the role.

62.   <u>Third</u>. On May 6, 2024, Mr. Wang applied to a Data Scientist, Products Analytics role on Meta's career website, submitting with his application a copy of his resume, listing his status as a U.S. citizen. Had Mr. Wang been hired for the role, he would have chosen to work out of Meta's Menlo Park or Sunnyvale, California offices. Mr. Wang met both the "Minimum Qualifications" for the role—which required a Bachelor's degree in Mathematics, Statistics, or a relevant technical field—and the "Preferred Qualifications" for the role—which required a Master's degree or Ph.D. in a quantitative field. However, Mr. Wang was rejected by Meta for the role without any interview.

63.   <u>Fourth through Ninth</u>. Between June 18, 2024 and June 22, 2024, Mr. Wang applied to six Data Scientist job roles with Meta on the State of California's career website, CalJOBS, which were located in Menlo Park or Sunnyvale, California. With each application, Mr. Wang submitted a copy of his resume, which lists his status as a U.S. citizen.  Mr. Wang was well-qualified for each of the roles, which required a Master's degree in Computer Science, Engineering, Mathematics,

Statistics, or a related field (Mr. Wang holds a Master's degree in Engineering and a Ph.D. in Statistics with 15+ years of relevant experience). Despite his qualifications, Mr. Wang received no follow-up communication from Meta regarding his applications, and was not interviewed, nor hired, for the Data Scientist roles.[9]

64.    At the same time Mr. Wang was applying to Data Scientist jobs with Meta, the company was actively seeking PERM certifications and Labor Condition Application certifications for Data Scientist roles, which would allow the company to fill those roles (or continue staffing those roles) with non-citizen visa workers. As such, while there were qualified U.S. citizens available to fill roles in the U.S. for which Meta had job openings, rather than hiring Mr. Wang—a highly qualified Data Scientist—Meta instead took active steps to fill the roles in question with non-citizen visa workers.

65.    Like Mr. Rajaram and Ms. Bhatia, Meta did not hire Mr. Wang because of his citizenship, and Mr. Wang would have been hired absent Meta's systematic preference for visa holders in hiring for certain U.S. positions. Mr. Wang was a victim of Meta's ongoing discriminatory scheme whereby he was not hired for permanent positions within the company that Meta had earmarked for its visa holders (the very same conduct at issue in the DOJ's multi-year investigation of Facebook, resulting in a complaint being filed against Facebook (a lawsuit that ultimately settled)). He was also foreclosed from applying to other positions with Meta that matched his skillset that Meta did not advertise on its career website or CalJOBS—the locations where Mr. Wang typically looks for open roles with Meta, and instead advertised only in more obscure locations, such as in newspapers.

---

[9] Mr. Wang does not maintain records of his other applications to Meta during the relevant time period, but estimates that he applied to a number of additional roles with Meta for which the company will have records.

1

*Plaintiff Browne's Experiences*

2    66.    Mr. Browne is a Senior Data Scientist with over twenty years of professional

3  experience. He holds a Bachelor of Science from the University of Warwick (in the United Kingdom),

4  a Master of Science in Applied Statistics from Birkbeck, University of London, and a Master of

5  Science in Data Science from the University of Washington. Mr. Browne has spent the last sixteen

6  years working in the technology industry, and has spent the past thirteen years at Amazon where he

7  has held a variety of engineering and science roles. Mr. Browne currently works as a Senior Data

8  Scientist for Amazon where he is responsible for end-to-end implementation of machine learning

9  models that identify and resolve Amazon Retail customer defects (among other job responsibilities).

10

11    67.    In November and December 2024, Mr. Browne was contacted by Thanh Nguyen, a

12  Data Scientist/Engineering recruiter for Meta, on four occasions asking if he was interested in joining

13  the company. On November 4, 2024, Mr. Nguyen reached out to Mr. Browne stating: "Your strong

14  background caught my eye and I think you would make a valuable addition to the Data Scientist

15  teams here at Meta." Just five days later, Mr. Nguyen emailed Mr. Browne again, following-up on

16  his prior email, and sharing the same compliment. On November 24, 2024, Mr. Nguyen contacted

17  Mr. Browne, stating: "I came across your profile and I was impressed with your career progression

18  thus far and wanted to connect to see if you'd be interested in learning more about the opportunities

19  we have here at Facebook." Then, on December 19, 2024, Mr. Nguyen emailed Mr. Browne,

20  following-up on his November 24 email, and stating that he was "[h]appy to keep in touch and also

21  be [Mr. Browne's] point of contact for future opportunities if now is not a good time."

22

23    68.    On January 26, 2025, Mr. Browne saw an advertisement by Meta in the San Francisco

24  Chronicle for a Data Scientist Manager position with the company (reference code REQ-2412-

25  144943). Companies like Meta that file PERM Labor Certifications and need to advertise the position

26  in newspapers and professional journals often use the San Francisco Chronicle for this purpose. The

27

28

job posting stated that the position was to be based in Menlo Park, California, but that telecommuting was permitted from anywhere in the U.S. The individual hired for the role would be responsible for helping build and lead a Data Science team at Meta, and the base salary range for the position was between $225,859 to $234,894 per year.

69.     Mr. Browne applied to the position on Meta's career website that same day. As part of his application, Mr. Browne submitted a copy of his resume that lists his dual citizenship (United States and United Kingdom). The application itself also asked Mr. Browne whether he required sponsorship now or in the future to work in the U.S. Mr. Browne answered "no," as he is a U.S. citizen.

70.     Mr. Browne was a good fit for the role, given that he has held a Senior Data Scientist role at Amazon for the past five years, has previously held a manager role, and also has a Master of Science Degree in Data Science. In addition, Mr. Browne's resume notes that he has built teams at Amazon (where he has worked the past thirteen years). Further, Meta itself reached out to Mr. Browne on multiple occasions stating that he would "make a valuable addition to the Data Scientist teams here at Meta."

71.     After submitting his job application, Mr. Browne received an email from Meta acknowledging his submission. On February 15, Mr. Browne checked the status of his application on Meta's career website. Meta's website stated that Meta was not moving forward with Mr. Browne's candidacy. Meta did not contact or interview Mr. Browne for the Data Scientist Manager role, and rejected him without proper consideration.

72.     Upon information and belief, Meta did not hire Mr. Browne for this position as it was reserved for a visa employee who Meta wished to work permanently in the U.S. Meta did not hire Mr. Browne because of his citizenship, and Mr. Browne would have been hired absent Meta's systematic preference for visa holders in hiring for certain U.S. positions. Like the other Plaintiffs,

Mr. Browne was a victim of Meta's ongoing discriminatory scheme whereby he was not hired for a permanent position within the company that Meta had earmarked for its visa holders (the very same conduct at issue in the DOJ's multi-year investigation of Facebook, resulting in a complaint being filed against Facebook (a lawsuit that ultimately settled)). And Mr. Browne was foreclosed from applying to other positions with Meta that matched his skillset that Meta did not advertise on its career website—the location where Mr. Browne typically looks for open roles with Meta, and instead advertised only in more obscure locations, such as in newspapers.

*Plaintiff Webb's Experiences*

73.    Mr. Webb is a Senior Data Engineer / Data Scientist who holds a Bachelor of Science in Computer Science from the California Institute of Technology and a Master of Science in Computer Science – Machine Learning from the University of Washington. Mr. Webb specializes in algorithms and machine learning and is also skilled in Python (a programming language) and SQL (a database query language). Mr. Webb's academic training in algorithms, quantum computing, and machine learning has allowed him to quickly measure and gain insights from data. Prior to working for Meta as a Senior Data Scientist (a contractual role through Crystal Equation Corporation), Mr. Webb served as a Training Data Engineer for FalconX, where he was responsible for, *inter alia*, risk and revenue analytics for crypto derivatives trading and volatility production for exchange quote optimization.

74.    Facebook, and now Meta, first began recruiting Mr. Webb for work in 2018, reaching out to him repeatedly via email and LinkedIn to see whether Mr. Webb was interested in applying for a Machine Learning position with Facebook. Mr. Webb expressed interest in a role with Facebook at this time, and had an initial telephone call with Minho Cho, a Machine Learning Recruiter for Facebook, on July 23, 2018. While Mr. Webb was then advanced to the next round of the interview

process by Facebook and scheduled for a coding interview on August 9, 2018, he secured alternate employment prior to that date, and did not ultimately interview further with Meta in 2018.

75.     On December 13, 2021, Tiffany Tan, a recruiter for Meta, reached out to Mr. Webb via email, as the company was looking to hire in-office and remote engineers, and Ms. Tan encouraged Mr. Webb to reach out to her if he was interested in joining Meta. Mr. Webb was in fact interested, and had a telephone call with Ms. Tan on December 20, 2021 to discuss job openings at Meta. Over the next three months, Mr. Webb received multiple emails from Meta, which included coordinating interviews and asking Mr. Webb to complete a work authorization form. Per the December 20, 2021 email Mr. Webb received, at Meta, "[t]he first step [in progressing through the application process] is to sign up for a career profile and fill out a U.S. Work Authorization form." Mr. Webb completed the form, as required, confirming that he did not require sponsorship to work for Meta as he is a U.S. citizen. Mr. Webb performed well in his interviews and passed both the initial programming screen as well as two more advanced programming and coding screens. However, despite performing well in his interviews and having strong engineering skills, Meta did not hire Mr. Webb for an engineering role and rejected his candidacy in March 2022.

76.     In August 2023, Mr. Webb began working for Meta as a Senior Data Scientist, a contractual employee role staffed through one of Meta's third-party vendors, Crystal Equation Corporation. Upon starting his employment, Mr. Webb provided Crystal Equation Corporation with a copy of his passport, in order to process his Form I-9, which indicated that he was a U.S. citizen.

77.     Consistent with Meta's corporate practice of directing, controlling, and supervising the work of the staff provided by third-party contractors such as Crystal Equation Corporation, Infosys, and others (i.e., "contractual employees"), the work performed by Mr. Webb for Meta was at the direction and control of Meta, and benefitted Meta. Mr. Webb's day-to-day work was overseen by Chen Zheng, a Meta employee, who served as Mr. Webb's manager. Mr. Webb's work was also

supervised by Aaron Arima and Anke Xu who worked for Meta. Meta closely supervised all work performed by Mr. Webb and virtually every decision made by Mr. Webb or other contractual employees had to be approved by a Meta employee. Like other contractual employees, Mr. Webb was jointly employed by Meta and Crystal Equation Corporation.

78.    Mr. Webb was placed on a data engineering team at Meta, called Enterprise Infrastructure, Security, and Analytics, that was staffed with both contractual workers, like Mr. Webb, and other employees of Meta. Mr. Webb and his team worked remotely for Meta, with Mr. Webb working from his home in New Hampshire and other team members working remotely in Fremont, California and New York, New York. Webb's team was managed by Chen Zheng, a Chinese national and Meta employee.

79.    The Enterprise Infrastructure, Security, and Analytics team that Mr. Webb was a part of had started a few years before Mr. Webb began working for Meta and was comprised of a large number of contractual workers and a small number of other Meta employees. Non-contractual Meta employees on Mr. Webb's team were predominantly Chinese and held H-1B visas or had recently received their green cards. The contractual workers provided by Crystal Equation Corporation, on the other hand, were a mix of U.S. citizens (both of American descent and Korean decent) and Chinese and Indian H-1B visa workers.

80.    Mr. Webb's understanding is that Meta and Crystal Equation Corporation had previously maintained an "up-or-out" agreement where, contractual employees who worked for Meta for approximately two years (or, in some cases, more) were either retained as non-contractual Meta employees, or terminated. If retained as a non-contractual Meta employee, the worker received much higher compensation and better benefits than contractual employees, and as such, a promotion—in which one was hired by Meta as a non-contractual employee— was highly desirable.

81.    Mr. Webb performed well in his Senior Data Scientist role at Meta, was well received by other Meta employees, and supported a number of successful projects during his first six months with the company. Mr. Webb was highly regarded for his data science capabilities and was also known outside of his team at Meta for these abilities. When Mr. Webb performed consultative work for other teams at Meta outside of Enterprise Infrastructure, Security, and Analytics, his work was highly praised by several senior Meta managers. This, in turn, led Mr. Webb to be contacted by other internal Meta teams for help and to utilize his data science skills.

82.    However, despite Mr. Webb's strong performance, he was not retained by Meta and was terminated. Instead, in accordance with Meta's discriminatory scheme, only the Chinese H-1B visa contractual workers were retained by the company (despite the fact that other team members had comparable experience and tenure working for Meta than those individuals). Examples of visa employees who were retained by Meta include Keer Huang and Jingyuan Lin.

83.    Further, Mr. Webb and his colleagues, who were also U.S. citizens and contractual workers, were treated more harshly by Ms. Zheng than their Chinese visa-dependent colleagues. For instance, Mr. Webb was once reprimanded for his "communication style," where he adopted a more conversational tone in early documents he worked on. However, once Mr. Webb learned that his manager preferred a highly formal and bullet-point centric style for documents, he quickly modified his tone and adhered to this preferred style. Chinese visa workers, on the other hand, were allowed to submit poorly formatted documents that, while they adhered to the bullet point style, were riddled with analytical errors and grammatical mistakes, without reprimand. In addition, when Mr. Webb proposed a new metric framework to estimate the risks of security vulnerabilities after the team had been asked repeatedly by Ms. Zheng to create better and more creative metrics for such applications, Ms. Zheng flatly dismissed Mr. Webb's proposal, failing to consider it and offering a few perfunctory style criticisms. Similarly, when Mr. Webb later proposed a new way of viewing existing metrics, his

THIRD AMENDED COMPLAINT

proposal was again dismissed by Ms. Zheng, without justification. Ms. Zheng's pattern of discrimination extended to hiring decisions as well. In the latter months of Mr. Webb's tenure with Meta, his team and the broader Enterprise organization within Meta made a push to hire more Data Scientists. As the most senior Data Scientist on the team, Mr. Webb was asked to interview top candidates that Crystal Equation Corporation was considering hiring to work as contractors for Meta. Following these interviews, Mr. Webb (and his colleagues who assisted in the interview process) recommended two well-qualified candidates for hire who, upon information and belief, were both U.S. citizens. Ms. Zheng later rejected both candidates with no explanation.

84.    In late July 2024, Mr. Webb received a call from Rafal Decowski, an employee of Crystal Equation Corporation to whom Mr. Webb reported to on the Crystal Equation Corporation side for Human Resources purposes that was also attended by a Human Resources Representative from Crystal Equation Corporation. On that call, Mr. Webb was informed that his contract with Meta was being discontinued on August 9, 2024. When Mr. Webb asked whether he could be transferred to another team within Meta as his data scientist skills were in demand, as Crystal Equation Corporation had been actively trying to hire additional data scientists to service Meta, he was explicitly told that Ms. Zheng was not allowing him to transfer to another team. Mr. Webb's Korean colleague (also a U.S. citizen) received the same fate a few months earlier, and like Mr. Webb, was terminated rather than being retained as Meta employees like visa-dependent contractual workers on the team. Some months after Mr. Webb's departure from Meta, all contractual technical workers on his team, with the exception of Chinese visa workers, were terminated and were denied transfer to other internal teams at Meta. The two Chinese visa employees who were retained by Meta were allowed to transfer internally to other teams and remained employed by Meta.

85.    Mr. Webb's termination by Meta—and its failure to hire him—came just months after Mr. Webb had received four recruiting emails from Jack Charlton, a Meta Sourcer supporting the

infrastructure and product pipelines at Meta, asking Mr. Webb if he would be interested in Machine Learning Senior Tech roles, noting that he was "super interested in [Mr. Webb's] experience." In addition, just two months prior, on May 23, 2024, Mr. Webb was recruited by Robbie Bobay, a recruiter for Meta, for E6 machine learning engineering opportunities with Meta. Mr. Webb responded that same day, noting that he would be interested in a remote role with Meta (with some travel into the Cambridge, MA office), that he was currently working for Meta as a data scientist through a managed service company, and that his strengths were in data science and algorithms. However, as Mr. Webb noted, those skills are adjacent to machine learning, and if he was a potential match for a machine learning role, Mr. Bobay should schedule a conversation. Mr. Webb did not receive a response to his email.

86.    Between October 24 and October 30, 2024, Mr. Webb was contacted three times by Michael Woo, a Technical Recruiter for Meta who was seeking candidates for Tech Lead / Staff Level Software Engineers for Meta's machine learning / AI teams. Mr. Woo was based out of California. Mr. Woo noted in his October 24 email that Mr. Webb had interviewed with Meta approximately two years ago, and, on information and belief, knew that Mr. Webb was a U.S. citizen. On October 30, 2024, Mr. Webb responded to Mr. Woo's outreach, noting that his skills were strong with respect to algorithms, statistics-like work, research, and prototyping, and that he was also fairly skilled in general software or data engineering in the right setting. Mr. Webb also shared that while he does have somewhat dated research contributions to machine learning, he does not hold Ph.D., and that his software engineering skills were not quite as strong as someone who spent their entire career as a software engineer.

87.    Mr. Webb then had a telephone call with Mr. Woo on November 7, 2024 where he discussed his past experience and skill set. On that call, Mr. Woo stated that he had both Data Scientist and Machine Learning roles available, and that in his view, Mr. Webb's skill set made him a strong

THIRD AMENDED COMPLAINT

candidate for Machine Learning roles even though his career has primarily been focused in data science. Mr. Webb agreed to move forward with the interview process for a Software Engineer, Machine Learning position with the company.

88.    Mr. Webb was then scheduled for a 1-hour virtual interview with Meta that consisted of coding and behavioral portions. Prior to that interview, Mr. Webb received an email on November 12, 2024, asking him to "complete the required U.S. Work Authorization form," which Mr. Webb completed, confirming that he did not require sponsorship to work in the U.S.

89.    On November 25, 2024, Mr. Webb completed his virtual interview with Meta. The following day, Mr. Webb emailed Mr. Woo, informing him that the interview went well and asking when they might be able to schedule the full loop interview, assuming he passed the prior interview round. On December 2, 2024, Mr. Webb received an email from Mr. Woo, thanking him for meeting with its engineers, but informing him that Meta had decided not to move forward with his candidacy. When Mr. Webb asked whether any feedback was given by his interviewer, as, in his view, the interview went well, and inquired as to the policy on applying to other roles with Meta (machine learning or otherwise). Mr. Woo responded that "[u]nforutnately the interviewers don't share feedback with the recruiting team," and stated that Mr. Webb could not apply to Meta again for another year given the "cooling period" after his interview. Mr. Woo did not submit Mr. Webb for a Data Scientist role with Meta despite such roles being open and Mr. Webb's extensive experience in this area.

90.    On January 21, 2025, Mr. Webb was contacted by Avneet Grewall of Mindlance, a third-party recruiter for Meta, via LinkedIn regarding a Data Analyst role with Meta. Mr. Grewall then scheduled a telephone call with Mr. Webb that same day where they discussed his background and experience, and Mr. Webb expressed interest in the Data Analyst role. During that call, Mr.

Grewall asked Mr. Webb the name of his prior Meta manager, and Mr. Webb provided that information.

91.    Later that day, Mr. Webb submitted his resume to Mr. Grewall for the position, and granted Mr. Grewall permission to submit an application to Meta on his behalf. Mr. Webb was well qualified for the role, and met the minimum, preferred, and hard skill requirements listed in the job description. Specifically, Mr. Webb has the requisite 4+ years of experience designing, running, and presenting data analysis and 3+ years of querying data or performing statistical analysis (minimum qualifications). In addition, Mr. Webb holds a Bachelor's Degree in Computer Science and a graduate degree in a related field, Computer Science – Machine Learning (preferred qualifications). Further, Mr. Webb is able to code in SQL, has the requisite presentation skills, and data analytic skills (top hard skills). Shortly after Mr. Grewall submitted Mr. Webb's application to Meta, he stopped contacting Mr. Webb, and when Mr. Webb inquired as to the status of his application, Mr. Grewell stated either that he had not heard anything from Meta or his outreach was ignored completely. Mr. Grewall eventually stopped responding to Mr. Webb. Mr. Webb was not interviewed, nor hired, by Meta for this Data Analyst role.

92.    Mr. Webb was highly qualified for the roles he applied to with Meta given his strong background in data science, experience with machine learning, and prior work experience with Meta as a contractual employee. However, upon information and belief, Meta did not hire Mr. Webb for a full-time role when he performed contractual work for the company as Meta preferred to hire visa workers for full-time employment from its third-party vendors. Further, upon information and belief, the additional roles Mr. Webb was rejected for by Meta were reserved for visa employees who Meta wished to work permanently in the U.S. Meta did not hire Mr. Webb because of his citizenship, and Mr. Webb would have been hired absent Meta's systematic preference for visa holders in hiring for certain U.S. positions. Like the other Plaintiffs, Mr. Webb was a victim of Meta's ongoing

THIRD AMENDED COMPLAINT

discriminatory scheme whereby he was not hired for a permanent position within the company that Meta had earmarked for its visa holders (the very same conduct at issue in the DOJ's multi-year investigation of Facebook, resulting in a complaint being filed against Facebook (a lawsuit that ultimately settled)). And Mr. Webb was foreclosed from applying to other positions with Meta that matched his skillset, which Meta did not proactively contact him for, and instead advertised only in more obscure locations, such as in newspapers.

## CLASS ACTION ALLEGATIONS

93.     Plaintiffs brings this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for Meta's systematic pattern and practice of discrimination against U.S. citizens and non-visa holding individuals in the United States. This action is brought on behalf of the following class:

> All individuals who are not visa holders who applied for the following positions with (or within) Facebook and/or Meta in the U.S., either directly or through a third party vendor, and were not hired: Software Engineer, Research Scientist, Data Scientist, Data Engineer, Data Analyst, Engineer, Engineering Manager, Machine Learning, and PLM roles.

> All individuals who are not visa holders who were employed by Facebook and/or Meta in the U.S., either directly or through a third-party vendor (e.g., Crystal Equation Corporation, Infosys, and others), and were terminated.

94.     Members of the classes are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed to be in the thousands. Furthermore, class members are readily identifiable from information and records in Meta's possession.

95.     There are numerous questions of law and fact common to members of the classes. Among the common questions of law or fact are:  (a) whether Meta has intentionally discriminated against individuals who are not visa holders (i.e., citizens) in making hiring/termination decisions; (b) whether Meta has intentionally favored visa holders in hiring/termination decisions, and/or whether Meta has intentionally disfavored non-visa holders (i.e. citizens) in hiring/termination

THIRD AMENDED COMPLAINT

decisions; (c) whether Meta's policy and practice of relying on visa holders is intentionally discriminatory; (d) whether Meta has violated § 1981; (e) whether equitable and injunctive relief is warranted for the classes; and (f) whether compensatory and/or punitive damages are warranted for the classes.

96.     Plaintiffs' claims are typical of the classes. Members of the classes were damaged by the same discriminatory practices employed by Meta.

97.     Plaintiffs will fairly and adequately protect the interest of other class members because they have no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in class litigation to represent Plaintiffs and the classes.

98.     Plaintiffs and the classes they seeks to represent have suffered substantial losses in earnings and other employment benefits and compensation as a result of Meta's actions.

99.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Meta has acted and/or refused to act on grounds generally applicable to the classes, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the classes as a whole. Members of the classes are entitled to declaratory and injunctive relief to end Meta's systematic, common, uniform, unfair, and discriminatory policies and practices.

100.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because the issue of liability is common to the classes and the common nucleus of operative facts forms the central issue, which predominates over individual issues of proof. The primary question common to the classes is whether Meta has discriminated on the basis of citizenship in its hiring practices. This question is central to the case and predominates over individual issues among the members of the proposed classes. Meta has engaged in a common course of discriminatory conduct in a manner that has harmed all class members. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because certification will avoid the need for repeated litigation by each individual class member. The instant case will be eminently

manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

101.    Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Plaintiffs' claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate Meta's discrimination. Certification under this rule is also appropriate to decide whether Meta has adopted a systemic pattern and practice of citizenship discrimination in hiring. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

## COUNT I

### Disparate Treatment on the Basis of Citizenship in Violation of 42 U.S.C. § 1981
### (On behalf of Plaintiffs and the Class)

102.    Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

103.    This claim is brought by Plaintiffs on behalf of themselves and the classes.

104.    Throughout the class liability period, Meta (formerly Facebook) has engaged in a pattern and practice of discriminating against individuals who are not visa holders (i.e., citizens) by: (a) knowingly and intentionally favoring individuals with visas in job placement (*i.e.*, hiring/staffing) decisions and termination decisions, and (b) knowingly and intentionally disfavoring individuals who are not visa holders (including Plaintiffs) in job placement (*i.e.*, hiring/staffing) decisions and termination decisions.

105.    As a direct and proximate result of Meta's intentional discrimination, Plaintiffs and class members have been denied employment and positions with Meta and/or terminated from Meta positions. And but for Meta's discrimination, Plaintiffs and class members would not have been denied employment and positions with Meta or otherwise terminated from Meta.

106.    Meta's actions constitute unlawful discrimination on the basis of citizenship in violation of 42 U.S.C. § 1981.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the class pray for relief as follows:

a.    Certification of the case as a class action pursuant to Fed. R. Civ. P. 23;

THIRD AMENDED COMPLAINT

b.    Designation of Plaintiffs as representative of the class;

c.    Designation of Plaintiffs' counsel as counsel for the class;

d.    A declaratory judgment that the practices complained of herein are unlawful and violates the Civil Rights Act of 1866, 42 U.S.C. § 1981;

e.    A permanent injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

f.    Order Defendant to adopt a valid, non-discriminatory method for hiring, staffing, and other employment decisions;

g.    Order Defendant to post notices concerning its duty to refrain from discriminating against employees on the basis of citizenship;

h.    Award Plaintiffs and the Class damages – including (without limitation) compensatory, exemplary, and punitive damages for the harm they suffered as a result of Defendant's violations of § 1981;

i.    Award Plaintiffs and the Class pre- and post-judgment interest at the prevailing rate on the compensatory damages as a result of Defendant discriminating against them in violation of § 1981;

j.    Award Plaintiffs and the Class front- and back-pay, instatement, and such other equitable relief as the Court deems just and appropriate;

k.    Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

l.    Award Plaintiffs and the Class such other relief as this Court deems just and appropriate.

**JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38, Plaintiffs and the Class respectfully demand a trial by jury on all issues properly triable by a jury in this action.

THIRD AMENDED COMPLAINT

DATED:    March 26, 2025                        Respectfully submitted,

By: /s/Daniel Low
Daniel Low, SBN 218387
Daniel Kotchen (*pro hac vice*)
Lindsey Grunert (*pro hac vice*)
**KOTCHEN & LOW LLP**
1918 New Hampshire Avenue NW
Washington, DC 20009
Telephone: (202) 471-1995
Email: dlow@kotchen.com
Email: dkotchen@kotchen.com
Email: lgrunert@kotchen.com

*Attorney for Plaintiffs and Putative Class*

THIRD AMENDED COMPLAINT